UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                      :
PHILLIP LESHINSKY,                                    :
                                      Plaintiff,      :
                                                      :          10 Civ. 4511 (JPO)
                      -v-                             :
                                                      :          MEMORANDUM
TELVENT GIT, S.A., TELVENT FARRADYNE,  :          OPINION AND ORDER
INC., TELVENT CASETA, INC., GLENN                     :
DEITIKER, and ALFREDO ESCRIBA,                        :
                                                      :
                                      Defendants.  :
                                                      :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

         This case concerns whistleblower claims brought under Section 806 of the Sarbanes-

Oxley Act of 2002 ("Sarbanes-Oxley"), codified at 18 U.S.C. § 1514A(a) ("Section 806"),[1] as

amended by Section 929A of the Dodd-Frank Wall Street Reform and Consumer Protection Act

of 2010, Pub. L. No. 111–203, 124 Stat. 1376, 1852 (2010) ("Dodd-Frank").  Plaintiff, Phillip

Leshinsky, alleges that Defendants Telvent GIT, S.A., Telvent Farradyne, Inc., Telvent Caseta,

Inc., Glenn Deitiker, and Alfredo Escriba (collectively, "Defendants") wrongfully terminated his

employment in violation of the whistleblower provisions of Sarbanes-Oxley.

         The present motion requires resolution of a novel question.  Prior to its amendment in

2010, Sarbanes-Oxley protected "employees of publicly traded companies" against retaliation for

whistleblowing.  18 U.S.C. § 1514A(a).  Dodd-Frank amended the statute to clarify that it

protects employees of *subsidiaries* of public companies—not just those employed directly by

public companies.  Plaintiff's claims in this case arose prior to the 2010 Dodd-Frank amendment,

and the Court therefore must address whether that amendment should be applied retroactively.

---

[1] Decisions dealing with this statute refer to this section alternately as "Section 806" or "Section 1514A."  Except
when directly quoting from another decision, this opinion will refer to the statute in question as "Section 806."

Because the amendment is a clarification of Congress's intent with respect to the Sarbanes-Oxley whistleblower provision, the Court concludes that it applies retroactively.  Accordingly, the Court has subject matter jurisdiction over Plaintiff's claims.

I.      **Background**

This case was previously before the Honorable Victor Marrero, United States District Judge.  At a status conference held on July 15, 2011 before Judge Marrero, Defendants raised an argument that the Court lacked subject matter jurisdiction over this case under Sarbanes-Oxley. In particular, Defendants argued that Section 806, by its plain language, applies only to employees of publicly traded companies, but that Plaintiff was employed only by non-public subsidiaries (specifically, Telvent Farradyne, Inc. and Telvent Caseta, Inc.) of the publicly traded defendant, Telvent GIT, S.A. ("Telvent GIT").  Because Plaintiff was never directly employed by Telvent GIT, Defendants argue that Section 806 does not apply to this case.

The Court initially scheduled an evidentiary hearing on these jurisdictional issues for October 18, 2011.  In the meantime, on October 4, 2011, the case was reassigned to the undersigned pursuant to this District's Rules for the Division of Business Among District Judges governing the reassignment of cases to new District Judges.

The evidentiary hearing was ultimately held on December 21, 2011 and January 9, 2012. Each side submitted proposed findings of fact and conclusions of law following the hearing.

Plaintiff argues that he has sustained his burden of establishing subject matter jurisdiction because the statute, as amended by Dodd-Frank, makes explicit that non-public subsidiaries of publicly traded companies may be liable under Sarbanes-Oxley's whistleblower provisions. Plaintiff argues that these provisions should be applied retroactively to this case because they served to clarify the earlier statute.  Plaintiff also argues that, in any event, the evidence establishes that Defendants could be liable under the earlier version of the statute.

Defendants' written and oral arguments are treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1).

The summary set forth below is drawn from the parties' submissions and the evidence adduced at the hearing.

### A.    Parties

Telvent GIT is an international information technology company headquartered in Spain. Shares in Telvent GIT are traded in the United States on the NASDAQ exchange.  Telvent GIT operates through an array of subsidiaries.  In 2008, Telvent GIT and its approximately thirty subsidiaries had approximately 6,100 employees located in 40 different countries and annual revenues of approximately $1.2 billion.[2]  Telvent GIT itself had approximately a dozen employees.

In May 2006, Telvent GIT announced that it was acquiring the Farradyne Division of Parsons Brinckerhoff, a large engineering company ("PB Farradyne").  At that time, Plaintiff was an employee of PB Farradyne, which was headquartered in Rockville, Maryland and was involved in the transportation and tolling industry.

The merger was structured such that a holding company (with no employees) called Telvent Traffic North America, Inc. ("TTNA") acquired PB Farradyne.  TTNA was owned, in turn, by Telvent Trafico y Transporte, S.A. ("TTYT"), which was owned by Telvent Energia, a wholly-owned subsidiary of Telvent GIT.  The only publicly traded entity among these companies was Telvent GIT.  After the merger, PB Farradyne became Telvent Farradyne, Inc. ("Farradyne").

---

[2] In this opinion, the term "Telvent," when used alone, will refer to the family of companies affiliated with the Telvent brand, all of which are ultimately under the umbrella of Telvent GIT.

All of the former PB Farradyne employees, including Plaintiff, were offered positions at Farradyne. The president of PB Farradyne, Lawrence Yermack, became president of Farradyne. Plaintiff was employed by Farradyne as Vice President, Toll Systems.

Defendant Alfredo Escriba was, for a period of time relevant to this case, the general manager of Farradyne.

In or about April 2007, Telvent GIT acquired Caseta Technologies, Inc., an Austin, Texas company, which developed and maintained software used in automated toll collection. The merger was effected through the same holding company, TTNA, that had acquired PB Farradyne. The acquisition of Caseta Technologies, Inc. brought Farradyne (and Telvent) into the business of selling tolling systems in the United States. Caseta Technologies, Inc. was renamed Telvent Caseta ("Caseta").

Defendant Glenn Deitiker was the founder of Caseta Technologies, Inc., and subsequently became president of Caseta.

Plaintiff, along with the two other Farradyne employees working in the tolling business, was assigned to Caseta after the acquisition. Plaintiff remained formally employed by Farradyne during this time, but he reported to Deitiker, in addition to continuing to report to Yermack.

There is no dispute that at all times relevant to this case Telvent GIT included the financial information of its subsidiaries, including Farradyne and Caseta, in its consolidated financial statements.

**B.      Relationship Among Telvent GIT, Farradyne, and the other Telvent Subsidiaries**

After the Farradyne acquisition, the Telvent companies became organized by areas of business—referred to as "verticals"—rather than geography. Thus, Yermack, as president of Farradyne, reported to Jose Maria Flores, who lived and worked in Spain, and was the Executive

Vice President of the Telvent companies' "transportation vertical."  Flores reported to Jose Montoya, who also worked in Spain.  Flores and Montoya were employed by TTYT, and were not directly employed by the parent entity, Telvent GIT.

Budgets were created within each operating company, followed by negotiations with the management of the relevant vertical.  The parties to the budget negotiations for Farradyne were generally Yermack, Escriba, Flores and Manuel Sanchez Ortega, Chief Executive Officer of Telvent GIT.  Actions within the budget did not require further approval, but expenditures above the budget required approval by TTYT.

Telvent's subsidiaries all adhered to certain corporate branding guidelines for the Telvent family of companies.  Thus, Farradyne employees were given "telvent.com" email addresses, and the email system was switched from Microsoft Outlook to Lotus Notes, which was the program used by the Telvent companies.  Telvent companies used a uniform font for public documents, and adopted a uniform "Telvent" logo and color (a particular shade of orange).  Public documents contained the slogan, "The Global Real Time IT Company."  Press releases from Telvent companies all referenced "Telvent GIT S.A. (NASDAQ TLVT), the Global RealTime IT Company."

Human Resources functions for Farradyne were administered by employees of other Telvent subsidiaries, located in Houston, Texas; Calgary, Canada; and Madrid, Spain.  Farradyne's in-house counsel reported to the general counsel for North America, located in Calgary, who was formally employed by a different Telvent subsidiary.  Telvent GIT provided guidelines for human resources policies for the subsidiaries, though the subsidiaries could request that certain policies be changed or customized to that particular company.  Information technology support was provided by employees of a different Telvent subsidiary in Calgary.

Plaintiff's employment agreement was written on "Telvent" letterhead, and was signed by Yermack, as president of PB Farradyne, Inc., and Jose Maria Flores, as Director of TTNA, the holding company used to acquire PB Farradyne.  The agreement referred to "Telvent" benefits and vacation entitlements, as well as "Telvent" employee application forms.

The parent company was involved, to an extent, in the day-to-day management of its subsidiaries.  One way this was accomplished was by appointing general managers of the subsidiaries in order to integrate them into the Telvent brand.  Thus, Manuel Sanchez Ortega (the CEO of the ultimate parent, Telvent GIT) initially appointed Jose Ramon Aragon, an employee of a Telvent entity in Spain, to be general manager of Farradyne.  Aragon worked at the headquarters of Farradyne in Rockville, Maryland and reported to Yermack.  Aragon stated to Plaintiff, Yermack, and others that he reported directly to Sanchez Ortega, though the extent to which that was actually the case is not clear.

Later, after complaints about harassing behavior by Aragon, Aragon was removed from his position as general manager of Farradyne and returned to Spain.  He was replaced as general manager of Farradyne by Alfredo Escriba.  Sanchez Ortega was directly involved in the removal of Aragon and his replacement by Escriba.  Sanchez Ortega also signed a letter to Plaintiff, stating the results of the internal investigation of the complaints about Aragon's behavior, and reiterating Telvent's policies against harassment and retaliation for complaints about harassment.

Sanchez Ortega met periodically with the managers of Farradyne, and served as one of six directors on Farradyne's board until April, 2008.  In the summer of 2008 (either at approximately the same time as Plaintiff's termination, or shortly thereafter), Sanchez Ortega moved his office, along with those of certain members of his staff, to the Rockville, Maryland premises of Farradyne.  In a letter contained in an internal newsletter announcing the move, Sanchez Ortega explained that the move was made because Telvent was continuing to grow its

6

North American business, and that, "from now on, we can, and we must, say that Telvent is a company headquartered in Madrid and in Rockville."  (Plaintiff's Proposed Findings of Fact and Conclusions of Law, Dkt. No. 35, ("Pl. Proposed Findings") ¶ 42.).)

### C.      Plaintiff's Termination

In July 2008, Plaintiff's employment was terminated.  The decision to terminate Plaintiff was made after discussions involving Yermack, Deitiker, Escriba, Carrie Glidden (who was in-house counsel at Farradyne), as well as Scott Doering and Gonzalo Sanchez Arias, who were managers of Caseta.  The meeting at which Plaintiff was told he would be terminated was held with Deitiker and Escriba; Lynne Cox, a human resources employee at a Telvent subsidiary in Calgary, led the meeting over the phone.  A termination letter was signed by Escriba.  A subsequent letter accelerating Plaintiff's termination date was signed by Lynne Cox.

Plaintiff alleges that he was terminated as a result of his raising objections to a proposal to use fraudulent information in connection with a bid to have Caseta obtain a contract with the New York Metropolitan Transit Authority ("MTA") for the maintenance and repair of the electronic toll registry system for the MTA bridges and tunnels E-Z Pass System.  Plaintiff alleges that his termination was in violation of Section 806 of Sarbanes-Oxley, which prohibits retaliation against corporate whistleblowers.

## II.      Discussion

This decision does not address the merits of Plaintiff's claim.  The Court holds only that it does have subject matter jurisdiction over the case under Section 806 of Sarbanes-Oxley.

### A.      Sarbanes-Oxley Section 806

Plaintiff brings this claim under Section 806 of Sarbanes-Oxley, which is codified at 18 U.S.C. § 1514A.  At the time of the events giving rise to this case, Section 806 of Sarbanes-Oxley read as follows:

(a) Whistleblower protection for employees of publicly traded companies.

No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C.A. § 1514A (2002).

Under this version of the statute, it was unclear whether "employees of publicly traded companies" included employees of the public company's wholly owned subsidiaries, or if the statute applied only to employees who were employed directly by the publicly traded parent company. Few federal courts considered the issue, although a handful of district courts held that the statute did not apply to employees of non-public subsidiaries. *See Hein v. AT&T Operations,*

*Inc.*, 09-cv-00291-WYD-CBS, 2010 WL 5313526 (D. Colo. Dec. 17, 2010); *Malin v. Siemens Med. Solutions Health Servs.*, 638 F. Supp. 2d 492, 501 (D. Md. 2008); *Rao v. Daimler Chrysler Corp.*, No. 06–13723, 2007 WL 1424220 (E.D. Mich. May 14, 2007).  These courts based their holdings on "the general principle of corporate law that a parent is not automatically liable for the actions of a subsidiary, absent a clear intent from Congress to the contrary."  *Rao*, 2007 WL 1424220, at *4.  As more fully discussed below, the Administrative Law Judges ("ALJs") of the Department of Labor ("DOL"), which was responsible for administering the provision, [3] reached widely divergent views on the issue, although a majority appeared to agree with the district courts' conclusion.  Neither the Courts of Appeals nor the ARB, which hears appeals from ALJ decisions, ever decided the issue.

On July 21, 2010, Section 806 was amended by Dodd-Frank to provide that no public company, "including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company," may retaliate against a whistleblowing employee.  Dodd-Frank § 929A.

On March 31, 2011, the ARB held that this amendment should apply retroactively to pending cases because the amendment is a mere clarification of the previous statute, intended to make "what was intended all along ever more unmistakably clear."  *Johnson v. Siemens Bldg. Tech., Inc.*, ARB No. 08-032, 2011 WL 1247202, at *11 (DOL ARB Mar. 31, 2011) (citation omitted).  The ARB also held that even "absent Dodd-Frank's amendment for subsidiary coverage in Section 929A, [the Board] would nonetheless hold that subsidiaries for the same reasons are covered under pre-amendment Section 806's term 'company.'"  *Id.*  The ARB's

---

[3] Congress explicitly delegated to the Secretary of Labor authority to enforce § 1514A by formal adjudication.  *See* 18 U.S.C. § 1514A(b).  The Secretary has delegated her responsibility for receiving and investigating whistleblower complaints to the Occupational Safety and Health Administration ("OSHA"), an agency within the DOL. Secretary's Order 5-2002; Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 67 Fed. Reg. 65,008-01, 65,008, 2002 WL 31358967 (Oct. 22, 2002); *see* 29 C.F.R. § 1980.103(c) (2011), and has delegated the authority to review decisions by ALJs to the DOL's Administrative Review Board ("ARB").  *See* 67 Fed. Reg. 64,272, 64,273 (Oct. 17, 2002).

conclusion was consistent with the views expressed by the Securities Exchange Commission ("SEC") and OSHA, each of which submitted an amicus brief to the ARB urging a conclusion that the Dodd-Frank amendment applied retroactively as a clarification of Congress's original intent in passing Section 806.  *See id.* at *11, *20.

### B.    Deference

Plaintiff argues that the Court should defer to the conclusions of the DOL and OSHA that the amendment applies retroactively.  Plaintiff argues that because these agencies "have responsibility for administering the provisions of Sarbanes-Oxley, their interpretations should be accorded deference" under *Chevron, USA, Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).  (Pl. Proposed Findings ¶ 65.)

There is authority that a court should "giv[e] deference to the ARB's interpretation of § 1514A."  *Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008); *see also Lawson v. FMR LLC*, 670 F.3d 61, 82 (1st Cir. 2012) (noting, in context of Section 806 claim, that "if there were an on-point holding of the ARB, it might be entitled to some deference as to any ambiguity in the statute").[4]  At the same time, courts have also recognized that "[a]n ARB decision is not binding authority on a United States district court."  *Wiest v. Lynch*, No. 10 Civ. 3288, 2011 WL 5572608 (E.D. Pa. Nov. 16, 2011).

As to the agencies' views expressed in the amicus briefs in *Johnson*, the Second Circuit has held that when an agency "advances a statutory interpretation in an amicus brief that has not been articulated before in a rule or regulation, we do not apply the high level of deference due" under *Chevron*.  *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v.*

---

[4] The Supreme Court has recognized that deference is appropriate when it appears from the "statutory circumstances that Congress would expect the agency to be able to speak with the force of law," and that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure," such as formal adjudication.  *United States v. Mead Corp.*, 533 U.S. 218, 229, 230 n.12 (2001).  *See Welch*, 536 F.3d at 276 n.2.

*Hartford Bd. of Educ.*, 464 F.3d 229, 239-40 (2d Cir. 2006).  "That does not mean, however, that [a court should] give no deference to the agency's view.  Rather, a reasonable agency determination, when advanced in an amicus brief that is not a *post hoc* rationalization, may be entitled to some deference on account of the specialized experience and information available to the agency." *Id.* (internal citations, quotation marks and brackets omitted) (citing, *inter alia*, *Skidmore v. Swift & Co.,* 323 U.S. 134, 139 (1944); *Mead*, 533 U.S. at 234-35).

Accordingly, it appears appropriate to accord deference pursuant to *Skidmore* to the views of the DOL, OSHA, and the SEC—agencies that are charged with administering Sarbanes-Oxley and Dodd-Frank.  In any event, the Court finds the reasoning of the ARB in *Johnson v. Siemens Building Technology* independently persuasive, and would reach the same conclusion even viewing the issue *de novo*.  Thus, the Court need not rely on any degree of deference to an ARB decision (or an SEC or OSHA amicus brief) on the question of retroactive application of an amendment to a statute that those agencies have the authority to administer and enforce.

## C.    Retroactive Application of Legislation that Clarifies a Statute

As a general rule, a new statute does not apply retroactively to conduct that occurred prior to the statute's enactment.  As the Supreme Court has noted, "the presumption against retroactive legislation is deeply rooted in our jurisprudence . . . ." *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994).  Thus, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  This presumption against retroactive legislation applies to "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past . . . ." *Landgraf*, 511 U.S. at 269 (quoting *Soc. for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (Story,

J.)).[5]  The presumption arises because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectation should not be lightly disrupted." *Id.* at 265.

Notwithstanding this presumption, several Courts of Appeals have held that when an amendment merely clarifies existing law, rather than effecting a substantive change to the law, then retroactivity concerns do not come into play.  *See Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 506-08 (3d Cir. 2008) (citing decisions "finding retroactivity to be a non-issue with respect to new laws that clarify existing law"); *Cookeville Reg'l Med. Ctr. v. Leavitt,* 531 F.3d 844, 849 (D.C. Cir. 2008) (finding "no problem of retroactivity" where new statute "did not retroactively alter settled law," but "simply clarified an ambiguity in the existing legislation"); *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004); *ABKCO Music, Inc. v. LaVere,* 217 F.3d 684, 689 (9th Cir. 2000) ("Normally, when an amendment is deemed clarifying rather than substantive, it is applied retroactively." (quotation marks and citation omitted)); *Piamba Cortes v. Am. Airlines, Inc.,* 177 F.3d 1272, 1283 (11th Cir. 1999) ("[C]oncerns about retroactive application are not implicated when an amendment . . . is deemed to clarify relevant law rather than effect a substantive change in the law."); *Pope v. Shalala,* 998 F.2d 473, 483 (7th Cir. 1993) ("A rule simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and has always been: 'It is no more

---

[5] The *Landgraf* Court elaborated that a

> court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.  Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts, and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at  269-70 (internal citation and quotation marks omitted).

retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand.'" (quoting *Manhattan Gen. Equip. Co. v. Comm'r,* 297 U.S. 129, 135 (1936))), *overruled on other grounds by Johnson v. Apfel,* 189 F.3d 561, 563 (7th Cir. 1999). "In effect, the court applies the law as set forth in the amendment to the present proceeding because the amendment accurately restates the prior law." *Piamba Cortes*, 177 F.3d at 1284.[6]

As these decisions have recognized, "there is no bright-line test" for determining whether an amendment clarifies existing law. *Levy*, 544 F.3d at 506 (citation omitted). But the decisions point to several factors for a court to consider: (1) whether the enacting body declared that it was clarifying a prior enactment; (2) whether a conflict or ambiguity existed prior to the amendment; and (3) whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history. *Middleton v. City of Chicago*, 578 F.3d 655, 663-65 (7th Cir. 2009); *cf. Levy*, 544 F.3d at 507 (holding that in determining whether agency regulation applies retroactively, a court should consider "(1) whether the text of the old regulation was ambiguous; (2) whether the new regulation resolved, or at least attempted to resolve, that ambiguity; (3) whether the new regulation's resolution of the ambiguity is consistent with the text of the old regulation; and (4) whether the new regulation's resolution of the ambiguity is consistent with the agency's prior treatment of the issue" (internal citations omitted)).[7] The fact that "an amendment alters, even 'significantly alters,' the original statutory language, . . . does

---

[6] The Second Circuit has not extensively addressed when a statute may apply retroactively as a clarification, but has cited some of these decisions with apparent approval in dicta. *See, e.g., King v. Am. Airlines, Inc*., 284 F.3d 352, 358 n.3 (2d Cir. 2002) (citing *Piamba Cortes*, 177 F.3d at 1283).

[7] The *Levy* panel stated that, unlike several other courts, it did not "consider an enacting body's description of an amendment as a 'clarification' of the pre-amendment law to necessarily be relevant to the judicial analysis." 544 F.3d at 507. This Court agrees that whether the amended statute expressly states that it is a clarification is not dispositive of the issue, but given the persuasive views of the other circuits, and the Supreme Court's guidance in *Landgraf* regarding retroactivity generally, the Court considers the legislature's stated intent a relevant consideration. *See Landgraf*, 511 U.S. at 272-73 ("Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."); *Brown*, 374 F.3d at 259 (holding that a court should, "of course, look[] to statements of intent made by the legislature that enacted the amendment").

'not necessarily' indicate that the amendment institutes a change in the law." *Brown*, 374 F.3d at

259 (quoting *Piamba Cortes*, 177 F.3d at 1283). Rather, the Court will apply the relevant factors

to determine whether Congress merely "ma[de] what was intended all along even more

unmistakably clear." *Id.* (citation omitted).

The ARB, applying these factors in *Johnson v. Siemens Building Technologies, Inc.*,

2011 WL 1247202, concluded that the Dodd-Frank amendment clarifies, rather than changes, the

statute's meaning. The Court agrees with this conclusion.

> **D.      Application of the Clarification Factors**

The Court turns to application of the three factors for determining whether a statutory

amendment is retroactive by virtue of being a clarification, as set forth by the Seventh Circuit in

*Middleton*, 578 F.3d 655.

> **1.      Statement of Legislative Intent**

First, the Court looks to whether Congress expressed any intent that Section 929A be

applied retroactively as a clarification.

Section 929A's text does not contain any statement that the amendment serves as a

clarification of Section 806. However, the Senate Report accompanying S. 3217, which

ultimately became Section 929A of Dodd-Frank, states that it

> [a]mends Section 806 of the Sarbanes-Oxley Act of 2002 to *make clear* that subsidiaries and affiliates of issuers may not retaliate against whistleblowers, eliminating a defense often raised by issuers in actions brought by whistleblowers. Section 806 of the Sarbanes-Oxley Act creates protections for whistleblowers who report securities fraud and other violations. The language of the statute may be read as providing a remedy only for retaliation by the issuer, and not by subsidiaries of an issuer. This *clarification* would eliminate a defense now raised in a substantial number of actions brought by whistleblowers under the statute.

S. Rep. No. 111-176, at 114 (2010) (emphasis added).

Courts have held that statements of intent to clarify that appear in the legislative history, rather than the text of the amendment itself, are of limited use. *See Piamba Cortes,* 177 F.3d at 1284 ("As a general rule, '[a] mere statement in a conference report of [subsequent] legislation as to what the Committee believes an earlier statute meant is obviously less weighty' than a statement in the amendment itself." (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13 (1980)). Therefore, the Court must "proceed with caution" in relying on this statement as expressing Congressional intent. *Middleton*, 578 F.3d at 664; *cf. Brown*, 374 F.3d at 259, 260 n.3 (holding that it was "[m]ost significant" that "Congress formally declared in the titles of the relevant subsections . . . that the amendments . . . were 'clarifying' and 'technical,'" and that "Congress clarified the meaning of [the statute] in actual legislation rather than only in the less formal types of subsequent legislative history, which constitute a hazardous basis for inferring the meaning of a [prior] congressional enactment" (citation and quotation marks omitted)).

In light of this authority, the Court does not rely on the statements in the Senate Report that the legislation was meant to "clarify" Section 806 as a definitive statement of Congress's intent, but does find it relevant to the overall analysis. That is, in the absence of other direct evidence in the text or structure of the statutory amendment as to Congress's intent on the issue, the language in the Senate Report provides some evidence (albeit not overwhelming or dispositive evidence) that the amendment was intended to be a "clarification," rather than a substantively new rule of law.

## 2.    Whether There Was Conflict or Ambiguity

The Court next examines whether there was a "conflict or ambiguity" in the statute prior to the amendment. *Middleton*, 578 F.3d at 663. The Court has little difficulty in concluding that there was such conflict and ambiguity regarding the statute's meaning.

15

### a.   Ambiguity in the Statutory Text

As one district court observed, "the statutory text [was] far from pellucid." *Lawson v.
FMR LLC*, 724 F. Supp. 2d 141, 152-53 (D. Mass. 2010), *motion to certify appeal granted*, 724
F. Supp. 2d 167 (D. Mass. 2010), *rev'd in part*, 670 F.3d 61 (1st Cir. 2012).  The text of Section
806 (pre-amendment) did not explicitly mandate whether employees of non-public subsidiaries
of a public company are protected.  The title of the section stated that it provides "protection for
employees of publicly traded companies," and the text of the statute referred generally to "an
employee" and "the employee."  15 U.S.C. § 1514A.  The statutory language did not define who
qualifies as an "employee of" the publicly traded company, and until it was amended it did not
address the issue of subsidiaries of the public company at all.  The statute did prohibit retaliation
by "any officer, employee, contractor, subcontractor, or agent of" the public company, but
whether the statute protected employees of an agent of the public company (and under what
circumstances a subsidiary could be considered an agent of the public parent) was also
ambiguous.[8]  As courts recognized, the statute did not "define the circumstances under which
any entity of a type not specifically mentioned in the statute may act as an agent of a covered
entity for purposes of whistleblower liability."  *Malin*, 638 F. Supp. 2d at 499.

OSHA issued regulations in connection with Section 806 that did not eliminate the
ambiguity.  Under 29 C.F.R. § 1980.101 (2003), an "employee" under section 806 of the Act was
defined as "an individual presently or formerly working for a company or company
representative, an individual applying to work for a company or company representative, or an
individual whose employment could be affected by a company or company representative."  This
suggests that employees of subsidiaries—whose employment surely "could be affected" by the

---

[8] In February 2012, the First Circuit decided, as a matter of first impression by a federal court, that employees of an
"officer, employee, contractor, subcontractor, or agent" of a public company were not covered by the statute.
Rather, an "officer, employee, contractor, subcontractor, or agent" of a public company was prohibited from
retaliating against an employee of the public company.  *Lawson*, 670 F.3d at 68.

parent—were included within the statute's protections.  However, OSHA stated in the notice of final rulemaking promulgating the regulations that "[t]hese rules are procedural in nature and are not intended to provide interpretations of the Act."  69 Fed. Reg. 52,104, 52,105 (Aug. 24, 2004).

### b.    ALJ Decisions

Although there are few federal court decisions addressing this issue, many decisions of the DOL ALJs, who are charged with hearing claims brought under the statute, confronted the issue directly.  A cursory review of these decisions makes clear that "the agency ha[d] not adopted a uniform interpretation of § 1514A's scope."  *Malin*, 638 F. Supp. 2d at 499.  *See Johnson*, 2011 WL 1247202, at *8 n.10 (collecting ALJ decisions reaching divergent results).

Some ALJs interpreted the language of Section 806 to hold that the statute did not protect the employees of non-public subsidiaries of public companies.  These decisions were based upon the principle that the subsidiary was "not a publicly traded company and [was] therefore not covered by the Act," *Grant v. Dominion East Ohio*, No. 2004 SOX 63, 2005 WL 6185928, at *31 (DOL ALJ Sept. 19, 2005), along with the "[t]he general principle of corporate law . . . that a parent corporation is not liable for the acts of its subsidiaries."  *Lowe v. Terminix Int'l Co.*, No. 2006 SOX 89, 2006 WL 6576807, at *5 (DOL ALJ Sept. 15, 2006).

These decisions recognized limited exceptions to this rule under principles of corporate law and agency law from the employment and labor context.  Thus, some decisions held that a non-public subsidiary could be covered by the Act if the judge could pierce the corporate veil and find that "the parent company and its wholly owned subsidiary are so intertwined as to represent one entity."  *Hughart v. Raymond James & Assocs., Inc.*, No. 2004 SOX 9, 2004 WL 5308719, at *43 (DOL ALJ, Dec. 17, 2004); *see also Bothwell v. Am. Income Life*, No. 2005 SOX 57, 2005 WL 6476839 , at *7 (DOL ALJ Sept. 19, 2005) ("Even in decisions holding that

the whistleblower protections found in the Act apply to employees of a non-public subsidiary of a publicly traded company, the administrative law judges have required the complainants to name the publicly traded parent as a respondent and to show sufficient commonality of management and purpose to justify piercing the corporate veil and holding the parent company liable for its subsidiary's actions." (citing cases)).  Other ALJs, focusing on the term "agent" from the statute itself, held that a non-public subsidiary could be liable if it acted as the public company's agent with respect to the adverse employment action.  *See, e.g., Savastano v. WPP Group, PLC*, No. 2007 SOX 34, 2007 WL 6857428, at *7 (DOL ALJ July 18, 2007) (holding that complainant was required to show that the non-public subsidiaries were "acting as agents of [the public parent] in connection with the termination of her employment").[9]  And other decisions imported the "integrated enterprise test" from labor law in order to "focus on labor relations and economic realities, rather than corporate formalities, to determine whether a parent corporation and its subsidiary are both liable for statutory violations."  *Merten v. Berkshire Hathaway, Inc.*, No. 2008 SOX 40, 2008 WL 7835816, at *5 (DOL ALJ Oct. 21, 2008) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485-86 (3d Cir. 2001)).  That test requires a plaintiff to show (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control.  *Id.* (holding that parent and subsidiary were not integrated enterprise, despite extensive personnel links and management controls by parent).

At the same time, a different line of ALJ decisions looked more broadly at the remedial purposes of Sarbanes-Oxley and held that these purposes would be fulfilled only if the

---

[9] These decisions also were not in accord as to whether an employee of a subsidiary must also name the public parent as a defendant.  *Compare Hughart*, 2004 WL 5308719, at *4 ("A publicly traded entity must be named in any complaint involving its subsidiaries to be held liable.") *with Lowe*, 2006 WL 6576807, at *5 ("A publicly held company does not have to be named as a respondent and it is possible for a privately held subsidiary of a publicly held company to fall within the Act" if the complainant "establish[es] an agency relationship" between the companies.).

whistleblower protection was interpreted to include employees of subsidiaries of the public company.  *See Morefield v. Exelon Servs., Inc.*, No. 2004 SOX 2, 2004 WL 5030303, at *4 (DOL ALJ, Jan. 28, 2004) ("Nothing in the Act persuades me that Congress intended to wall off from whistleblower protection [under] Sarbanes-Oxley vast segments of corporate America that reside under the umbrella of publicly traded companies. . . . To limit whistleblower coverage exclusively to those in the know, and their contractors or agents, at the level of the corporate parent is not compatible with the Act's intended purpose.").  In *Morefield*, the ALJ noted that Sarbanes-Oxley imposed extensive reporting and disclosure obligations on public companies, which include obligations to report information about the companies' subsidiaries.  The ALJ observed that subsidiaries represent an "integral part of the publicly traded company, inseparable from it for purposes of evaluating the integrity of its financial information," and that a "publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units."  *Id.* at *3. Thus, the ALJ concluded, "the term 'employee of a publicly traded company' as used in the caption of the whistleblower provision of Sarbanes-Oxley is sufficiently broad to include a[n officer] of a non-publicly traded subsidiary, within and integral to, the corporate structure" of the parent.  *Id.* at *3, *5; *see also Gonzalez v. Colonial Bank*, No. 2004 SOX 39, 2004 WL 5840274, at *3 (DOL ALJ Aug. 24, 2004) (declining to dismiss complaint where employee of subsidiary also named parent as respondent because "it is determined that Congress intended to provide whistleblower protection to employees of subsidiaries of publicly traded companies"); *Walters v. Deutsche Bank AG*, No. 2008 SOX 70, 2009 WL 6496755, at *20 (DOL ALJ Mar. 23, 2009) (providing comprehensive overview of "the legislative history, specific provisions, special policies, and purposes which anchor Sarbanes-Oxley and Section 806," as well as decisions

interpreting the provision, and concluding that Section 806 protects employees of subsidiaries of public companies).[10]

### c.   District Court Decisions

Defendants argue that whatever conflicts existed among ALJs, "[f]ederal district courts were unequivocal . . . in holding that a non-public subsidiary was covered by Sarbanes-Oxley only when the plaintiff proved the existence of an agency relationship."  (Defs. Letter, Nov. 18, 2011, Dkt. No. 43, at 3)  As an initial matter, courts have held that "the fact that an amendment conflicts with a judicial interpretation of the pre-amendment law" does not "mean that the amendment is a substantive change and not just a clarification."  *Levy*, 544 F.3d. at 507; *see also id.* ("[O]ne could posit that quite the opposite was the case—that the new language was fashioned to clarify the ambiguity made apparent by the caselaw." (citation omitted)).  But more importantly, the district court decisions were far from "unequivocal" on this issue.

The first decision to address the issue directly, *Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220, did not treat the issue as straightforward or clear.  The District Court for the Eastern District of Michigan, noting the "dearth of federal court decisions addressing the issue," looked to the administrative decisions for guidance.  *Id.* at *3 (citation and quotation marks omitted).  The court acknowledged the ALJ's reasoning in *Morefield*, but also took note of "a growing number of opinions among ALJs coming to the conclusion that a § 1514A plaintiff must name the public parent of its employer in order to have a valid whistleblower claim under Sarbanes-Oxley."  *Id.* at *4 (citing cases).  The court also noted that "at least two ALJs have rejected the

---

[10] The ARB never definitively weighed in on the issue prior to the Dodd-Frank amendments, and in fact, pointedly declined to decide the issue.  In *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, No. ARB 04-149, ALJ 04 SOX 11, 2006 WL 3246904 (DOL ARB May 31, 2006), the ARB noted that it had not yet had "occasion to discuss whether a non-public subsidiary of a public parent could be covered under  the Act," and did not "need to do so [in that case], in light of [its] other conclusions."  *Id.* at *9.  The ARB also expressly "le[ft] it to the ALJ to determine whether to grant Klopfenstein's motion to add [the parent] as a party."  *Id.* at *11. The ARB did not reach the broader question because it concluded that the non-public subsidiary in that case was an agent for purposes of the adverse employment action, and that was sufficient to find liability under the statute.  *Id.*

broad interpretation of Sarbanes-Oxley's purposes from *Morefield,* instead appealing to the general principle of corporate law that a parent is not automatically liable for the actions of a subsidiary, absent a clear intent from Congress to the contrary." *Id.* (citing *Lowe*, 2005 WL 6476839 and *Bothwell*, 2005 WL 6476839).

The *Rao* court ultimately based its decision on the canon of statutory construction that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).  As the *Rao* court pointed out, Congress included explicit references to subsidiaries in other parts of Sarbanes-Oxley, but not in Section 806.  Because "Congress could have specifically included subsidiaries within the purview of § 1514A if they wanted to," the court concluded that "general corporate law principle[s]" should apply.  *Rao*, 2007 WL 1424220, at *4.  The court was "mindful" of the broad remedial purposes of Sarbanes-Oxley, and the fact that "such concerns would support the inclusion of a public company's subsidiaries within Sarbanes-Oxley's whistleblower protection provision." *Id*.  But, the Court concluded, where "Congress only listed employees of public companies as protected individuals," these policy concerns would not allow the court to "rewrite clear statutory text." *Id.*

The handful of district court decisions to address the issue expressly followed the reasoning of the *Rao* court.  *See Malin*, 638 F. Supp. 2d at 500-01 ("This Court agrees with the reasoning in *Rao*:  to hold that non-public subsidiaries are subject to the whistleblower protection . . . would widen the scope of the whistleblower protection provisions beyond what Congress *appears* to have intended." (emphasis added)); *Hein*, 2010 WL 5313526, at *4 (citing *Rao* and *Malin*).  These decisions were not based on any express language in the statute, but rather on the

courts' interpretation of Congress's intent based on the lack of a specific reference to subsidiaries in Section 806.

Other federal court decisions embraced the possibility that the statute could protect employees of non-public subsidiaries, even without piercing the corporate veil or finding an agency relationship. In *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1373 n.7 (N.D. Ga. 2004), the district court looked to the OSHA regulations to determine that an employee of a non-public subsidiary of a public parent was covered by the statute because her employment "could be affected" by the public parent.

Several decisions acknowledged more implicitly the possibility that the statute covered employees of subsidiaries. For example, in *O'Mahony v. Accenture, Ltd.*, 537 F. Supp. 2d 506 (S.D.N.Y. 2008), the plaintiff was an employee of the U.S. subsidiary of a Bermuda-based publicly traded company. The court examined whether it would have "extraterritorial jurisdiction" over the different entities, and concluded that it would have subject matter jurisdiction over the United States subsidiary "because the alleged wrongful conduct and other material acts occurred in the United States by persons located within the United States." *Id.* at 515. The court also held that, based upon the allegations in the pleadings, it was unclear to what extent the parent participated in the alleged fraud or retaliation, or whether the parent maintained control over the subsidiary sufficient to pierce the corporate veil to hold the parent liable for the acts of its subsidiary. *Id.* But the court apparently did not question whether the fact that the plaintiff was employed by the subsidiary and not the public parent would have divested the court of jurisdiction under Section 806, even if the parent itself was not directly liable.

In *Carnero v. Boston Scientific*, 433 F.3d 1, 6 (1st Cir. 2006), which dealt with similar issues of extra-territorial application of Section 806, the court assumed, "without deciding," that an employee of foreign subsidiaries of a publicly traded U.S. company was a covered employee

22

of the public company.  Neither party contested that the plaintiff was a covered employee, but the court noted that the plaintiff, "by virtue either of his own asserted contacts with [the parent] or his direct employment by its subsidiaries, or both, may well be an 'employee' of [the parent] for purposes of seeking whistleblower relief under Sarbanes-Oxley," citing both the Northern District of Georgia's decision in *Collins*, 334 F. Supp. 2d at 1373 n.7, and the ALJ's decision in *Morefield*, 2004 WL 5030303.

Finally, the other decisions on which Defendants rely to show the purported "unequivocal" views of the federal courts do not directly confront the issue of protection of employees of wholly owned subsidiaries.  For example, *Brady v. Calyon Securities*, 406 F. Supp. 2d 307 (S.D.N.Y. 2007), did not deal with a non-public subsidiary at all.  That case dealt with the application of Section 806 to a research analyst for a securities broker-dealer who argued that his employers "acted as agents and/or underwriters of numerous public companies." *Id.* at 318.  The court reasoned that "[n]othing in the Act suggests that it is intended to provide general whistleblower protection to the employees of any employer whose business involves acting in the interests of public companies." *Id.*  The court acknowledged the line of ALJ decisions holding that non-public companies can be liable if they "acted as agents of publicly traded companies with respect to their employment relationships." *Id.* at 318 n.6.  The court also cited the *Morefield* decision to support the proposition that ALJs have held subsidiaries liable when they are "found to be almost inseparable from the publicly traded company, or subject to the same internal controls." *Id.*

In short, contrary to Defendants' assertion, the statute was ambiguous as to its application to employees of non-public subsidiaries, and this ambiguity is confirmed by the extensive conflict among the different judicial and administrative decisions applying the statute.

3.      **Whether the Amendment is Consistent with a Reasonable
Interpretation of the Prior Enactment and its Legislative History**

The ARB in *Johnson* concluded that even absent Dodd-Frank, it would "nonetheless hold
that subsidiaries for the same reasons are covered under pre-amendment Section 806's term
'company.'"  2011 WL 1247202, at *11.  This Court need not reach that result to hold that the
amendment serves as a clarification of the earlier statute.  Indeed, the Court does not need to find
that the amendment reflects the correct or only possible interpretation of the original statute, but
rather that it is "consistent with a reasonable interpretation" of the statute.  *Middleton*, 578 F.3d
at 663.  The Court agrees with the ARB's conclusion that the amendment reflects a reasonable
interpretation of the statute.

The Court is guided here by "the familiar canon of statutory construction that remedial
legislation should be construed broadly to effectuate its purposes."  *Tcherepnin v. Knight*, 389
U.S. 332, 336 (1967).  Based on the policy and legislative history of Sarbanes-Oxley, the Court
concludes that it is reasonable to infer that Congress intended to provide protection for
whistleblowers at all levels of a public company's corporate structure, and not solely those who
were employed directly by the public entity itself.

a.      **Legislative History and Policy of Sarbanes-Oxley**

As several courts have observed, Congress passed the Sarbanes-Oxley Act "[a]fter a
series of celebrated accounting debacles," involving companies such as Worldcom and Enron.
*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, __ U.S. __, 130 S. Ct. 3138, 3147
(2010).  The statute was "designed to improve the quality of and transparency in financial
reporting and auditing of public companies."  *Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 9
(1st Cir. 2006).  Whistleblower protection formed a key component of the legislation.  As
summarized by Judge Straub:

24

> Congress enacted the Sarbanes-Oxley Act of 2002 . . . in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy. Congress recognized that the problem was an intractable one, and that a number of strong enforcement tools would be necessary— from new regulations and reporting requirements, to expanded oversight, to new criminal provisions. Congress also recognized that for *any* of these tools to work, the law had to protect whistleblowers from retaliation, because "often, in complex fraud prosecutions, . . . insiders are the only firsthand witnesses to the fraud." S. Rep. No. 107-146, at 10 (2002). Congress therefore made whistleblower protection central to the Act . . . .

*Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469, 484 (2d Cir. 2006) (Straub, J.,

dissenting).

The legislative history of Sarbanes-Oxley reinforces Congress's view of the importance of whistleblowers to the exposure of financial fraud within large, complexly structured corporations. The Senate Judiciary Committee Report accompanying the proposed legislation pointed to the "serious and adverse" consequences of the "corporate code of silence," which "creates a climate where ongoing wrongdoing can occur with virtual impunity." S. Rep. No. 107-146, at 5 (2002). The Report concluded that "[t]his corporate culture must change, and the law can lead the way." *Id.* at 10; *see also Walters*, 2009 WL 6496755, at *8-11 (collecting statements from legislative history emphasizing the importance of whistleblowers to anti-fraud efforts).

As the ARB observed, the "[p]rincipal sponsors of Sarbanes-Oxley and Section 806 viewed protecting whistleblowers as crucial means for assuring that corporate fraud and malfeasance would be publicly exposed and brought to light from behind the corporate veil." *Johnson*, 2011 WL 1247202, at *10. Senator Sarbanes explained that "Senator Leahy and his colleagues on the Judiciary Committee have moved ahead to provide additional protections and

remedies for corporate whistleblowers that I think will help to ensure that employees will not be punished for taking steps to prevent corporate malfeasance." *Id.* at 11.  And Senator Leahy explained that "meaningful protections for corporate whistleblowers" are necessary because "these corporate insiders are the key witnesses that need to be encouraged to report fraud and help prove it in court." *Id.*

The bill's sponsors also recognized the important roles that subsidiaries and corporate veils can play in facilitating corporate malfeasance.  The Senate Report notes in particular how Enron "used thousands of off-the-book entities to overstate corporate profits, understate corporate debts and inflate [its] stock price."  S. Rep. 107-146, at 2.  And Congress repeatedly expressed its view of the importance of whistleblowers to "complex fraud prosecutions" and "complex securities fraud investigations."  *Id.* at 10.

In light of the fact that corporate malfeasance can—and often does—occur within subsidiaries of a public company, and that such malfeasance was precisely what precipitated the passage of Sarbanes-Oxley, it is certainly reasonable to infer that, in enacting whistleblower protections, Congress intended to protect the employees of a corporation's subsidiaries in addition to employees of the parent itself.

**b.      Securities Laws and Other Provisions of Sarbanes-Oxley**

As the ARB pointed out, SEC filing requirements reinforce the idea that the provisions of Sarbanes-Oxley include subsidiaries within the Act's scope.  Section 806 applies to any "company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))."  15 U.S.C. § 1514A(a).  A registration statement under Section 12 includes the "separate and/or consolidated balance sheets or income accounts of any person directly or indirectly controlling or controlled by the issuer, or under direct or

indirect common control with, the issuer," which includes the issuer's subsidiaries. 15 U.S.C. §
78m(b)(1). Section 15(d) similarly requires the regular reporting of financial information of a
company, including information about that company's subsidiaries. 15 U.S.C. § 78*o*(d). And
SEC regulations require the consolidation of majority-owned subsidiaries into a reporting
company's financial reports. *See* 17 C.F.R. 210.3-01(a), 210.3A-02. In other words, for
purposes of reporting, a "public company" includes its subsidiaries.

Several of Sarbanes-Oxley's provisions expressly reinforce the importance of a
company's subsidiaries in gaining a picture of the overall financial state of that company. For
example, Section 302 requires officers of a company to certify in the company's periodic reports
that they have established "internal controls to ensure that material information relating to the
issuer and its consolidated subsidiaries is made known to such officers by others within those
entities, particularly during the period in which the periodic reports are being prepared." 15
U.S.C. § 7241(a)(4)(B). Section 301 of Sarbanes-Oxley provides standards for the establishment
of audit committees from corporations' boards of directors. 15 U.S.C. § 78j-1(m).[11] The audit
committee must establish procedures for "the confidential, anonymous submission by employees
of the issuer of concerns regarding questionable accounting or auditing matters." 15 U.S.C. §
78j-1(m)(4)(B). Although this particular provision "does not specifically mention subsidiaries,
there seems to be no serious dispute that it covers employees throughout the publicly traded
company's entire corporate family." *Walters*, 2009 WL 6496755, at *19. Indeed, "[m]easures
like these adopted by Sarbanes-Oxley to ensure the integrity of the organization's accounting

---

[11] Members of the audit committee, beyond their membership on the board of directors "shall otherwise be
independent," and may not "be an affiliated person of the issuer or any subsidiary thereof." 15 U.S.C. § 78j-
1(m)(3). In other words, notwithstanding the fact that a subsidiary is a separate corporation, a person affiliated with
a company's subsidiary would not be considered otherwise independent for purposes of auditing the public
company.

practices pay no heed to the technicalities of internal corporate veils." *Morefield*, 2004 WL 5030303, at *3.

Of course, some courts have interpreted the express reference to subsidiaries in Section 302 to imply that Section 806, which does not mention subsidiaries, does not cover such subsidiaries. But it is just as reasonable to conclude that, in light of the fact that a "public company" includes its subsidiaries for purposes of financial reporting, the reference to such companies in Section 806 necessarily "encompasses subsidiaries . . . whose financial information is included in the consolidated financial information filed by the parent company as part of its registration statement or periodic reports." *Johnson*, 2011 WL 1247202, at *10. As the ALJ in *Morefield* explained:

> The publicly traded entity is not a free-floating apex. When its value and performance [are] based, in part, on the value and performance of component entities within its organization, the statute ensures that those entities are subject to internal controls applicable throughout the corporate structure, that they are subject to the oversight responsibility of the audit committee, and that the officers who sign the financials are aware of material information relating to the subsidiaries. A publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units; and Congress insisted upon accuracy and integrity in financial reporting at all levels of the corporate structure, including the non-publicly traded subsidiaries.

*Morefield*, 2004 WL 5030303, at *3.

This case perfectly illustrates this principle. According to the testimony at the hearing, Telvent GIT itself was effectively a holding company, with only approximately *a dozen* employees. The Telvent family of companies, however, had approximately 6,100 employees. Telvent GIT had annual revenues of approximately $1.2 billion, *all* of which was generated by the various subsidiaries. Thus, the financial condition of Telvent GIT was entirely dependent upon the financial condition of its subsidiaries. And further, corporate malfeasance within

Telvent GIT's subsidiaries would directly affect the value of Telvent GIT's stock.  To the extent that Congress sought to protect investors in Telvent GIT through protection of whistleblowers who could provide valuable information about the workings of the company, the employees of the subsidiaries are at least as important as, if not more important than, the dozen employees of the parent company.

The amicus brief that the SEC submitted to the ARB in the *Johnson* case makes this point:

> Interpreting Section 806 not to cover consolidated subsidiaries would mean that whether a whistleblower was protected would turn on whether he worked for the parent or an unincorporated division rather than for a subsidiary, even though the consequences of his reporting misconduct would be exactly the same in both situations.  It seems quite unlikely that Congress intended that outcome.  Nor would it make sense to exclude from whistleblower protection the employees most likely to know of misstatements in consolidated financial statements, such as misstatements concerning inventory and sales at subsidiaries where inventory is maintained and sales staff is actually located.

*Johnson*, 2011 WL 1247202, at *11.

In short, in light of the policy behind Sarbanes-Oxley, and the treatment of subsidiaries throughout the statutory scheme, the Dodd-Frank amendments reflect a reasonable interpretation of Section 806.

### E.   Other Recent Decisions Do Not Preclude Retroactive Application of the Amended Language

#### 1.   Court Decisions Declining to Apply Dodd-Frank Retroactively

Defendants argue that the Court should not apply the Dodd-Frank amendments to Section 806 retroactively because most courts applying Dodd-Frank have held that the statute's provisions are not to be applied retroactively.  Indeed, the parties have identified only one decision applying a Dodd-Frank amendment to Sarbanes-Oxley retroactively:  *Pezza v. Investors*

29

*Capital Corp.*, 767 F. Supp. 2d 225 (D. Mass. 2011), which held that the Dodd-Frank ban of pre-dispute arbitration of whistleblower claims under Sarbanes-Oxley applied to conduct before the amendment's enactment.  Other decisions, however, expressly rejected the conclusion of the *Pezza* court with respect to that same provision.  *See Taylor v. Fannie Mae*, No. 11-cv-1189 (RCL), 2012 WL 928170, at *8-10 (D.D.C. Mar. 20, 2012) (rejecting *Pezza* because the court "fail[ed] to see how a retroactive application would not impair the parties' rights possessed when they acted"); *Holmes v. Air Liquide USA LLC*, Civil Action No. H-11-2580, 2012 WL 267194, at *6 (S.D. Tex. Jan. 30, 2012) ("Ultimately, the Court cannot agree with the holding in *Pezza* that the portions of Dodd–Frank at issue affect only procedural rights."); *Henderson v. Masco Framing Corp.*, No. 3:11-CV-00088-LRH, 2011 WL 3022535, at *4-5 (D. Nev. July 22, 2011). Defendants point to numerous other decisions that declined to apply other Dodd-Frank provisions retroactively.  *See, e.g., Riddle v. Dyncorp Int'l Inc*., 666 F.3d 940, 944 (5th Cir. 2012) (noting that new statute of limitations imposed by Dodd-Frank would not apply if the effect would be to revive a claim that would have expired before the effective date of the statute);  *Mejia v. EMC Mortg. Corp.*, No. CV 09-4701 CAS (CFEx), 2012 WL 367364, at *5 n.4 (C.D. Cal. Feb. 2, 2012) ("Plaintiffs' contentions under the recently enacted Dodd-Frank Act also fail because the provisions of the act do not apply retroactively.").

        None of these decisions—all of which are from outside this Circuit—controls the Court's decision here.  None of them deals with retroactive application of Section 929A of Dodd-Frank to the interpretation of Section 806 of Sarbanes-Oxley.  More broadly, these decisions do not address whether an amendment under Dodd-Frank operates retroactively because it is a clarification of the original statute.  For example, in *SEC v. Daifotis*, No. C 11-00137 WHA, 2011 WL 2183314, *12 (N.D. Cal. June 6, 2011), the court held that the SEC could not maintain an action pursuant to "*new* authority for the Commission—and new liabilities and remedies"

because these provisions could not apply retroactively.  The Dodd-Frank amendment to Section 806 does not create new liabilities and remedies—it simply clarifies a provision that was already present in the statute.

The Court today does not express any view about the retroactive application of Dodd-Frank in general, or of any other specific provisions of Dodd-Frank.  The Court concludes only that the amendment adding express references to subsidiaries to Section 806 does not create retroactivity problems because it serves as a clarification of the statute's original meaning.

### 2.    The First Circuit's Recent Decision in *Lawson*

After the hearing, the parties submitted letters to the Court discussing the potential impact of the First Circuit's decision this past February in *Lawson v. FMR LLC*, 670 F.3d 61 (1st Cir. 2012).  There, the court addressed the question, certified for appeal by the district court, whether Section 806  covered employees of "any officer, employee, contractor, subcontractor, or agent" of a public company, or only employees of the public company itself.  15 U.S.C. § 1514A (2002).  The plaintiffs in the case were employees of private companies that provided advising or management services to a family of mutual funds (which were registered with the SEC and were required to file reports under Section 15(d) of the Exchange Act).  The plaintiffs argued that they were employees of "contractors" of public companies and therefore were covered by the statute. The court concluded that the plaintiff employees were not covered by Section 806, holding that "the clause 'officer, employee, contractor, subcontractor, or agent of such company' goes to who is prohibited from retaliating or discriminating, not to who is a covered employee . . . ."  *Id.* at 68.[12]

---

[12] Judge Thompson filed a dissenting opinion, stating that the majority's conclusion was inconsistent with the plain language of the statute, which, "boil[ed] . . . down to its relevant syntactic elements," provided that "'no . . . contractor . . . may discharge . . . an employee.'"  *Id.* at 84 (quoting 18 U.S.C. § 1514A(a) (Thompson, J., dissenting).

The court in *Lawson* did not address whether employees of wholly owned subsidiaries could be covered employees, nor did it address whether the Dodd-Frank amendment to Section 806 could be applied retroactively as a clarification of Congress's intent as to that question.  In fact, the court, citing the Senate Report, noted that the Dodd-Frank amendments served as a "clarification" that "was necessary" to prevent the statute from being read not to provide protection for employees of subsidiaries.  *Id.* at 80; *see also id.* at 80 n.21 (noting that "Congress said its concern was to clarify § 1514A(a)").  The court appeared to contrast this clarification provision with the Cardin-Grassley amendment to Dodd-Frank, which, in the words of Senator Cardin, "*expands* the provision to include employees of the rating companies." *Id.* at 80 (citing 156 Cong. Rec. S3349 (daily ed. May 6, 2010)) (emphasis added).  The court stated that "Senator Cardin's statement again confirms that the covered employees are only those of publicly traded companies." *Id.*  Describing both of these provisions of Dodd-Frank, the court concluded that "these later actions by Congress are entitled to some weight as an expression of Congress's understanding of § 1514A(a)'s meaning, which is consistent with our understanding." *Id.* at 80.  Implicit in the court's summary of these amendments is the idea that, while Section 806 needed to be "expanded" to include employees of rating agencies, Congress only needed to "clarify" that the provision always included employees of subsidiaries.

Thus, not only does the First Circuit's analysis in *Lawson* not preclude the Court's conclusion today, it arguably supports it.

### F.     Application of the Earlier Labor Law Tests

Applying the earlier labor law-derived tests to this case only serves to further demonstrate that the amended language is more consistent with the statute's purpose than the contrary reading.

Plaintiff argues that, even if Dodd-Frank is not applied retroactively, Defendants may still be liable because the subsidiaries, which directly employed Plaintiff, were agents of Telvent GIT.  In particular, Plaintiff argues that because "Telvent GIT directed and controlled the operations and employment decisions of its subsidiaries," Plaintiff should be deemed an employee of Telvent GIT.  (Pl. Proposed Findings ¶ 67.)  Plaintiff cites a decision from this Court that alludes to the ALJ decisions holding that subsidiaries may be liable if they "acted as agents of publicly traded companies *with respect to their employment relationships*.  Thus, a non-publicly-traded company can be deemed to be the agent of a publicly traded company if the publicly traded company directs and controls the employment decisions."  *Brady*, 406 F. Supp. 2d at 318 n.6.

Defendants argue that a non-public subsidiary can be liable only if Plaintiff can demonstrate the existence of "extraordinary circumstances" that justify "treat[ing] the employees of a corporate entity as the employees of a related entity."  *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).  To do this, Defendants argue, Plaintiff must show that the companies meet the test to be deemed a single, "integrated enterprise."  *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995).  This test, adapted from the labor and employment context, requires a plaintiff to show the following factors:  (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and, (4) common ownership or financial control.  *Id.*  This "single employer" exception applies where there are "sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer."  *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 308 (S.D.N.Y. 1998) (citation omitted).

The second factor—"centralized control of labor relations"—has been deemed the "most important factor." *Dewey v. PTT Telecom Netherlands, U.S., Inc.,* No. 94 Civ. 5983, 1995 WL 425005, at *2 (S.D.N.Y. July 19, 1995). Courts have held that this factor can be "distilled to a critical question: what entity made the final decision regarding employment matters related to the person claiming discrimination?" *Regan v. In the Heat of the Nite, Inc*., No. 93 Civ. 862 (KMW), 1995 WL 413249, at *3 (S.D.N.Y. July 12, 1995) (citation omitted). Courts also look to factors such as the following:

> whether the subsidiary has a separate human resource department and whether it establishes its own policies and makes it[s] own decisions as to the hiring, discipline, and termination of its employees. Also relevant is whether employment applications are sent to the parent, whether personnel status reports are approved by the parent, whether the subsidiary must clear all major employment decisions with the parent, and whether the parent routinely shifts employees between the two companies.

*Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 403 (S.D.N.Y. 1999) (internal citations and quotation marks omitted).

To show interrelationship of operations, courts look to:

> (1) whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) whether the two entities shared employees, services, records, and equipment; (3) whether the entities commingled bank accounts, accounts receivable, inventories, and credit lines; (4) whether the parent maintained the subsidiary's books; (5) whether the parent issued the subsidiary's paychecks; and (6) whether the parent prepared and filed the subsidiary's tax returns.

*Herman*, 18 F. Supp. 2d at 309 (citation omitted).

The evidentiary hearing in this case revealed many indicia of control of operations in general—and employment matters in particular—by Telvent GIT. For example, Plaintiff's employment agreement with Farradyne was on "Telvent" letterhead. And although the human

resources or information technology functions at Farradyne were not administered by employees of Telvent GIT itself, the fact that these functions were administered out of different Telvent subsidiaries demonstrates the interrelationship between the subsidiaries and the parent.

In addition, the fact that Sanchez Ortega, CEO of Telvent GIT, installed the general managers of Telvent's newly acquired subsidiaries, and that those general managers had extensive control over day-to-day operations and personnel management, demonstrates some involvement by the parent, even if those managers were not directly consulting with the parent itself with regard to each decision.  And the fact that Plaintiff himself was "shift[ed] . . . between [subsidiary]. . . companies," *Meng*, 73 F. Supp. 2d at 403, also shows a degree of involvement with operations and personnel management by Telvent GIT.

At the same time, it is not clear that Telvent GIT was so directly involved as to meet the standards established by the cases that arise in the employment context.  It is difficult to conclude that Telvent GIT's control of labor relations truly "exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary."  *Dewey*, 1995 WL 425005, at *2 (citation and quotation marks omitted).  And it is undisputed that no representative from the parent itself was involved in the "final decision" to terminate Plaintiff. *Regan*, 1995 WL 413249, at *2.  But this only illustrates the inappropriateness of the labor law approach to this issue.

The "integrated enterprise" test is designed to test whether a parent company can be liable for the employment decisions of a related entity.  Thus, the test naturally focuses on the degree of control by the parent over employment matters.  In the context of an employment discrimination case, it makes sense to look primarily at who was involved in making the decision giving rise to the charge of discrimination.  Or, in a case involving sexual harassment, it is necessary to determine who made the decisions that "construct[ed] the conditions of

35

employment."  *Salemi v. Boccador, Inc.*, No. 02 Civ. 6648, 2004 WL 943869, at *5 (S.D.N.Y.

Apr. 29, 2004).

Sarbanes-Oxley, however, is not a labor or employment statute—it is an anti-fraud statute

concerned with corporate transparency.  *See Johnson*, 2011 WL 1247202, at *16 (Brown, J.,

concurring).  Indeed, Title VIII of Sarbanes-Oxley, which contains Section 806, is entitled

"Corporate and Criminal Fraud Accountability."  *See* Pub. L. No. 107–204, 116 Stat. 745 (2002).

As one ALJ explained:

> Section 806 . . . does not protect employees for the sake of improving labor
> standards or conditions. . . . It provides job security, in theory at least, as a means
> of encouraging employees voluntarily to take an action Congress deems in the
> public interest. Like a reward to an informant, Section 806 affords an inducement
> to volunteers to provide needed information.  It is no more intended primarily as a
> job protection measure than a reward is intended primarily to enrich the
> informant.  Although it uses job protection as the method to achieve its purpose,
> the whistleblower protection provision in Section 806 is intended by Congress to
> serve as a vital antifraud reform designed to protect public investors by creating
> an environment in which whistleblowers can come forward without fear of losing
> their jobs.

*Walters*, 2009 WL 6496755, at *11.

Thus, as a matter of policy under Sarbanes-Oxley, it makes more sense to focus on

whether a subsidiary was the parent's agent "for purposes of producing accounting or financial

information which is consolidated into the parent's financial reports," than whether the

subsidiary was the parent's agent with respect to human resources matters.  *Walters*, 2009 WL

6496755, at *7.

Here, Telvent sought to establish a uniform, global corporate brand that included all of its

subsidiaries.  Indeed, press releases by subsidiaries included a reference to the parent company

and the fact that it is publicly traded on the NASDAQ exchange.  Although day-to-day

operational and personnel decisions were largely performed by the subsidiaries independently of

the parent, the subsidiaries directly contributed to the financial state of the company, and the

36

financial information of the subsidiaries was included in the consolidated financial statements of the parent.  A whistleblower statute that protects investors in Telvent GIT would be concerned not so much with who made the day-to-day employment decisions, but rather with decisions that affect the value of the company.

**III.     Conclusion**

For the foregoing reasons, the Court concludes that the Dodd-Frank amendment to Section 806 of Sarbanes-Oxley applies retroactively as a clarification of the statute.  Plaintiff, as an employee of the subsidiary of a public company whose financial information is included in the consolidated financial statements of the public company, is a covered employee under Section 806.  The Court therefore has subject matter jurisdiction over this case, and Defendants motion to dismiss is denied.

The parties are to submit a joint letter to the Court no later than July 23, 2012 stating what steps will be necessary to prepare the case for trial, including any period of additional discovery and whether the parties wish to file any further dispositive motions.

SO ORDERED.

Dated:  New York, New York
        July 9, 2012

_____
J. PAUL OETKEN
United States District Judge