UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
PHILLIP LESHINSKY,                                          :
                                    Plaintiff,              :
                                                            :          10 Civ. 4511 (JPO)
                    -v-                                      :
                                                            :          MEMORANDUM AND
TELVENT GIT, S.A., TELVENT FARRADYNE,                       :          ORDER
INC., TELVENT CASETA, INC., GLENN                           :
DEITIKER, and ALFREDO ESCRIBÁ,                              :
                                                            :
                                    Defendants.             :
                                                            :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiff Phillip Leshinsky brought this action against Defendants Telvent GIT, S.A.

(Telvent GIT"), Telvent Farradyne, Inc. ("Farradyne"), Telvent Caseta, Inc. ("Caseta"), Glenn

Deitiker, and Alfredo Escribá (collectively, "Defendants") , alleging whistleblower claims under

Section 806 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), codified at 18 U.S.C. §

1514A(a) ("Section 806" or "Section 1514A"), as amended by Section 929A of the Dodd-Frank

Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111–203, 124 Stat. 1376,

1852 (2010) ("Dodd-Frank").  Plaintiff alleges that Defendants wrongfully terminated his

employment in violation of the whistleblower provisions of Sarbanes-Oxley.

       Before this Court at present is Defendants' Motion for Summary Judgment, the resolution

of which requires the Court to the address several questions of first impression concerning the

scope of the Sarbanes-Oxley retaliation provision.   For the reasons that follow, Defendants'

Motion for Summary Judgment is granted in part and denied in part.

## I.      Background

### A.      Factual Background

The following facts are drawn from Defendants' Local Rule 56.1 Statement (Dkt. No. 53 ("Defs.' 56.1")), Plaintiff's Opposition to Defendants' Local Rule 56.1 Statement (Dkt. No. 59 ("Pl.'s 56.1 in Opp'n")), Plaintiff's Local Rule 56.1 Statement (Dkt. No. 61 ("Pl.'s 56.1")), Defendant's Opposition to Plaintiff's Local Rule 56.1 Statement (Dkt. No. 63 ("Defs.' 56.1 in Opp'n), and the underlying evidence cited therein.  The facts are construed in the light most favorable to Plaintiff, the non-movant.

#### 1.      Defendants

Telvent GIT is an international information technology company headquartered in Spain.

In July 2006, Telvent GIT announced that it was acquiring PB Farradyne, Inc. ("PB Farradyne").  (Defs.' 56.1 at ¶ 11.)  After the merger, PB Farradyne became Farradyne.  The president of PB Farradyne, Lawrence Yermack, became president of Farradyne.   Plaintiff was employed by Farradyne as Vice President, Toll Systems.  (*Id.* at ¶ 12.)

Defendant Alfredo Escribá was, for a period of time relevant to this case, the general manager of Farradyne.  (*Id.* at ¶ 22).  He reported to Yermack.  Escribá's predecessor was José Ramón Aragón; Aragón had been considered by Plaintiff and others to be an abusive manager, and Plaintiff reported his problems with Aragón to Yermack.  Farradyne's switch in general managers was a result of this misbehavior.  (*Id.* at ¶ 15-22.)

In or about April 2007, Telvent GIT acquired Caseta Technologies, Inc., an Austin, Texas company, which developed and maintained software used in automated toll collection.  The merger was effected through the same holding company, TTNA, that had acquired PB Farradyne.  The acquisition of Caseta Technologies, Inc. brought Farradyne (and Telvent) into

the business of selling tolling systems in the United States.  Caseta Technologies, Inc. was renamed Telvent Caseta.  (*Id.* at 23-25; Pl.'s 56.1 at ¶ 6.)

Defendant Glenn Deitiker was the founder of Caseta Technologies, Inc., and subsequently became president of Caseta.  (Defs.' 56.1 at ¶ 25.)

### 2.  Plaintiff

Plaintiff joined PB Farradyne as a Technical Manager on December 1, 1997.  (*Id.* at ¶ 8.) At this point, Plaintiff already had a close friendship with Yermack, going back nearly fifteen years.  (*Id.* at ¶ 3.)  Yermack and Plaintiff knew each other from their days working for the Triborough Bridge and Tunnel Authority, a division of the Metropolitan Transportation Authority ("MTA"); indeed, Yermack hired Plaintiff into his first position at MTA in 1987 or 1988.  (*Id.* at ¶¶ 1-2.)

Plaintiff left PB Farrayne in February 2003, but returned in August 2005 as Technical Manager/Director of Toll Services.  (*Id.* at ¶ 9.)  Plaintiff stayed on after PB Farradyne became Farradyne; he became Vice President, Toll Systems, and continued to report to Yermack.  (*Id.* at ¶ 12.)

Plaintiff, along with the two other Farradyne employees working in the tolling business, was assigned to Caseta after the acquisition.  Plaintiff remained formally employed by Farradyne during this time, but he reported to Deitiker, in addition to continuing to report to Yermack.  (*Id.* at ¶ 27.)

### 3.  The MTA Bid

On January 22, 2008, Caseta received a request for proposals ("RFP") from MTA for a fixed-priced toll-system maintenance contract, divided among cost, profit, and overhead costs, which are calculated by dividing direct labor costs by indirect expenses.  (*Id.* at ¶¶ 33-38.)  In

early 2008, Plaintiff was involved in a project for congestion pricing in New York City.  (*Id*. at ¶ 48.)

On February 6, 2008, a bid/no-bid meeting concerning MTA's RFP for its toll system maintenance contract was held at the Caseta offices in Austin, Texas; Detiker, Doering, Escribá, Shannon Swank, Darby Swank, Scott Hooton, Paul Muzzey, Ed Fuchs, Gonzolo Sánchez Arias, and Plaintiff were present.  (*Id*. at ¶¶ 52-53.)  During the meeting, the attendees discussed strategies for winning the bid by reducing overhead "as a matter of reducing the overall price." (*Id*. at ¶¶ 58-59.)  In his deposition, Plaintiff testified that:

> Darby [Swank] raised the possibility, he said we had two audited overhead rates.  Maybe if we, you know, we use one as our external rate and they use the other one back, you know, internally, that we can reduce, looked like we reduce our [profits] margin but we still can keep the margin the same. . . . That there were two overhead rates we can use, one as our external rate, you know, and everything, but we can use the, the lesser one as our internal audited rate and everything and that way we, we could actually still keep the profit the same which Alfredo [Escribá] pretty much insisted on but we can reduce our pricing. . . . External we would always be using the higher [overhead rate].   But internal when we were calculating profit we would use the lesser one.

(*Id*. at ¶ 61.)  Plaintiff believed that the higher rate no longer existed, and thus that using the higher rates would artificially inflate costs.

In his deposition, Plaintiff stated that he "would not say a final decision was made" in the meeting about whether or not to pursue the so-called "two overhead strategy."  (*Id*. at ¶ 76.)

### 4.        Plaintiff's Objection

A few minutes after the end of the February 6, 2008 bid/no-bid meeting, Plaintiff went into Deitiker's office to lodge his objection to the two overhead strategy outlined at the meeting. Plaintiff was not sure if the strategy was illegal, but he believed it might be.  (*Id*. at ¶ 88; Pl.'s 56.1 in Opp'n. at ¶ 88.)   After entering Deitker's office, he

> told [Deitiker] that, number one, I thought . . . the two overhead strategy . . . was unethical, certainly immoral and may even be illegal but I wasn't sure since I'm not a lawyer.  I said but even from a risk standpoint, it was much worse.  Because if the agency ever found out we were doing it, not only wouldn't we get this contract, we would be pretty much dead in the industry in general.

(*Id*. at ¶ 86.)  Plaintiff does not recall if he "used the word 'fraud'" during their conversation. (*Id*. at ¶ 87.)

After Plaintiff expressed his concerns, Deitiker replied that it "was an important contract" for the company and "for him . . . personal[y]," and when Plaintiff renewed his objection, Deitiker, becoming angry, accused Plaintiff of "not being a team player."  (*Id*. at ¶¶ 90-92.) When Deitiker asked Plaintiff to "reconsider [his] objections," Plaintiff decided that he did not "want it to become extremely confrontational, more than it was, so [he] just left."  (*Id*. at ¶¶ 94-95.)  This was the only discussion Plaintiff had with anyone at Telvent companies about the two overhead strategy; he did not put the objection in writing.  (*Id*. at ¶¶ 96-97, 111-12.)

Caseta submitted its proposal to MTA on April 17, 2008.  (*Id*. at ¶ 122.)  In July 2008, MTA awarded the toll-system maintenance contract to Caseta as prime contractor.  (*Id*. at ¶ 131.)[1]  It is undisputed that the bid submitted to MTA did not utilize the two overhead strategy.

**5.   Plaintiff's Marginalization**

After Plaintiff's February 6, 2008 meeting with Deitiker, Plaintiff was cut off from any further involvement in the MTA bidding process.  (Dkt. No. 58 ("Pl.'s Decl.") at ¶ 31.)  It also appears that certain projects previously assigned to Plaintiff were given to other employees.  (*Id*.) In the spring of 2008, Plaintiff complained to Yermack and Doering about his marginalization,

---

[1] On July 3, 2008, Plaintiff sent Deitiker and Darby Swank an email "congratulating [them] on winning the MTA maintenance contract."  Plaintiff testified at his deposition that he was "was not sure" at this point if fraud had taken place, but that the email "was pro forma and [he] wanted to be a team player."  (*Id*. at 132.)

although he did not tell either of them that he suspected that the change in his status was a result of his conversation with Deitiker.  (Pl.'s 56.1 at ¶ 42; Defs.' 56.1 in Opp'n at ¶ 42.)

### 6.      Troubles at Work

Plaintiff had troubles at work, both before and after Plaintiff lodged his objection with Deitiker in February 2008.  For example, on April 28, 2008, Plaintiff attended an industry event in Orlando, Florida, where Plaintiff used a racially derogatory comment in front of Doering and Shannon Swank, although the specifics of the event are in dispute.  (Defs.' 56.1 at ¶¶ 151-156; Pl.'s 56.1 in Opp'n at ¶¶ 151-156.)  Emails from 2008 indicate that Doering and Yerman had both become increasingly frustrated by Plaintiff's behavior and the caliber of his work.  (*See, e.g.*, Dkt. No. 65 ("Genecin Decl."), Ex. 18; Defs.' 56.1 at ¶ 160; Genecin Decl., Ex 4 ("Yermack Dep.") at 106:9.)  However, in the spring of 2008, Yermack discouraged Plaintiff from quitting, because Plaintiff was, even at that point, "important to the operation."  (*Id.* at 108:21-22.)

In a memo dated June 27, 2008, Doering recommended laying off Plaintiff because, while

> Phil has been a tremendous contributor in the past . . . [he] has performed very poorly over the last 12 months.   It appears he has lost all interest in being part of the team and has ultimately turned, at times, into an obstacle to our efforts as this attitude has stifled effective communications.  This attitude has showed no signs of changing.

(Defs.' 56.1 at ¶ 166.)

### 7.      Plaintiff's Termination

On July 10, 2008, Plaintiff's employment was terminated.  (Defs.' 56.1 at ¶ 167.)  Two other employees working on the Caseta projects—Laurence Robinson and Bob Fielding—were laid off at the same time.  (*Id.* at ¶ 168.)  The decision to terminate Plaintiff was made after

discussions involving Yermack, Deitiker, Escribá, Carrie Glidden (who was in-house counsel at Farradyne), as well as Doering and Gonzalo Sanchez Arias, who were managers of Caseta. (*Id.* at ¶ 169.)

The meeting at which Plaintiff was told he would be terminated was held with Deitiker and Escribá; Lynne Cox, a human resources employee at a Telvent subsidiary in Calgary, led the meeting over the phone. A termination letter was signed by Escribá. (*Id.* at ¶¶ 171-72.) Plaintiff was told that his termination was part of a "restructuring" and that it was a "financial issue." (*Id.* at ¶¶ 173, 176). Yermack testified at his deposition that, after the meeting, Plaintiff called Yermack and told him he was "going to get Telvent," but Plaintiff denies making such a comment. (*Id.* at ¶ 174; Pl.'s 56.1 in Opp'n. at ¶ 174.)

A subsequent letter accelerating Plaintiff's termination date was signed by Lynne Cox.

### B.    Procedural Background

Plaintiff filed his complaint against Defendants on June 8, 2010. (Dkt. No. 1 ("Compl.").) Defendants answered on June 30, 2010. (Dkt Nos. 11-13.) On July 9, 2012, this Court denied Defendants' motion to dismiss, holding that the Dodd–Frank amendment to Section 806 of Sarbanes–Oxley applies retroactively as a clarification of the statute. *See Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582 (S.D.N.Y. 2012). On September 14, 2012, Defendants filed their Motion for Summary Judgment. (Dkt. No. 49 ("Defs.' Mem.").) Plaintiff opposed Defendant's Motion on November 19, 2012. (Dkt. No. 59 ("Pl.'s Opp'n.").) Defendants replied on December 21, 2012. (Dkt. No. 64 ("Defs.' Rep.").)

## II.   Discussion

### A.    Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the evidence shows that there is no genuine issue of material fact and that the moving party is

entitled to a judgment as a matter of law." *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 265-66 (S.D.N.Y. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)) (internal quotation marks omitted).  In such cases, the non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.  The Supreme Court has advised that an issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The initial burden of a movant on summary judgment, or partial summary judgment, is to provide evidence on each material element of his claim or defense illustrating his entitlement to relief.  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The Court must view all evidence and facts "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *In re Old Carco LLC*, 470 B.R. 688, 699-00 (S.D.N.Y. 2012) (quoting *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)).  To prevail on a claim for summary judgment, it must be demonstrated that "no reasonable trier of fact could find in favor of the nonmoving party."  *Id.*; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587); *see also Anderson*, 477 U.S. at 249-50.

### B.     Sarbanes-Oxley Section 806

Plaintiff brings this claim under Section 806 of Sarbanes-Oxley, which is codified at 18 U.S.C. § 1514A.  Enacted in the wake of the Enron and Arthur Anderson scandals, the Sarbanes-

Oxley retaliation provision was implemented to help rectify "a culture, supported by law, that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally."  S. Rep. No. 107-146, at 4-5 (2002).

Section 806 of Sarbanes-Oxley provides in relevant part:

> (a) Whistleblower protection for employees of publicly traded companies.
>
> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)), including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—
>
> (A) a Federal regulatory or law enforcement agency;
>
> (B) any Member of Congress or any committee of Congress; or
>
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

It is now well accepted that courts should construe Section 806 broadly. *See Mahony v. KeySpan Corp.,* No. 04 Civ. 554 (SJ), 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) ("The law was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors and the market." (citing 149 Cong. Rec. S1725-01, S1725, 2003 WL 193278 (Jan. 29, 2003)).

"Under [the] burden-shifting framework [of Section 806], the employee bears the initial burden of making a prima facie showing of retaliatory discrimination because of a specific act." *Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir. 2009). To succeed in making a *prima facie* case, "an employee must prove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Bechtel v. Administrative Review Bd., United States Dep't of Labor*, 2013 WL 791334, at *3 (2d Cir. Mar. 5, 2013) (citation omitted). Once a plaintiff has made its *prima facie* case, a defendant employer prevails only if "it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id.* (citation and internal quotation marks omitted); *see also* 18 U.S.C. § 1514A(b) ("An action brought under paragraph (1)(B) shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code."); 49 U.S.C. § 42121(b)(ii) ("[N]o investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.").

At the summary judgment stage, a plaintiff need only demonstrate that a rational factfinder could determine that Plaintiff has made his *prima facie* case. Assuming a plaintiff

does so, summary judgment is appropriate only when, construing all of the facts in the

employee's favor, there is no genuine dispute that the record *clearly and convincingly*

demonstrates that the adverse action would have been taken in the absence of the protected

behavior.  Thus, the defendant's burden under Section 806 is notably more than under other

federal employee protection statutes, thereby making summary judgment against plaintiffs in

Sarbanes-Oxley retaliation cases a more difficult proposition.  *Cf. Delville v. Firmenich, Inc.*,

No. 08 Civ. 10891, 2013 WL 363391, at *9 (S.D.N.Y. Jan. 31, 2013) (laying out a defendant's

burden under both Title VII and Age Discrimination in Employment Act).

   C.     *Prima Facie* **Case**

   As noted, to make a *prima facie* case under Section 806, Plaintiff must demonstrate that

(1) he engaged in protected activity; (2) the employer knew that he engaged in the protected

activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a

contributing factor in the unfavorable action.  Defendants contend that Plaintiff's Section 806

claim fails as a matter of law because Plaintiff did not engage in a protected activity and, even if

he did, it was not a contributing factor in Defendants' decision to terminate Plaintiff.

   **1.     Protected Activity**

   Pursuant to 18 U.S.C. § 1514A(a)(1), a plaintiff's activity is "protected" only if he (1)

"provide[s] information," (2) "regarding any conduct which the employee reasonably believes

constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or

1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange

Commission, or any provision of Federal law relating to fraud against shareholders," to (3) a

federal agency, Congress, or "a person with supervisory authority over the employee."

Defendants contend that Plaintiff's reporting fails to satisfy any of these three elements.

### a.        Providing Information of a Violation

Defendants argue that Plaintiff's interaction with Deitiker did not constitute a

"providing" of information under § 1514A.  Again, during their exchange, which took place

shortly after the February 6, 2008 meeting in which the prospect of using the two overhead rates

scheme was raised, Plaintiff

> told [Deitiker] that, number one, I thought . . . the two overhead
> strategy . . . was unethical, certainly immoral and may even be
> illegal but I wasn't sure since I'm not a lawyer.  I said but even
> from a risk standpoint, it was much worse.  Because if the agency
> ever found out we were doing it, not only wouldn't we get this
> contract, we would be pretty much dead in the industry in general.

Defendants contend that Plaintiff's statement to Deitiker was plainly insufficient to constitute

"providing information," as Plaintiff did not use the word "fraud" at the meeting, and was not

even sure if the "two overhead scheme" was illegal.

Section 806 requires an employee to "provide information . . . regarding any conduct

which the employee reasonably believes constitutes a violation," but does not explicitly indicate

to what extent a whistleblower must put his supervisor on notice that a particular violation has

been committed.  In support of its contention that "the words Plaintiff used" with Deitiker

needed to "put [him] on notice that [Plaintiff] was reporting conduct that violated mail or wire

fraud," Defendant cites *Platone v. United States Dep't of Labor*, 548 F.3d 322 (4th Cir. 2008).

(Defs.' Mem.  15-16)  In *Platone*, the Fourth Circuit affirmed the dismissal of a Sarbanes-Oxley

retaliation claim where the plaintiff  had failed to "definitively and specifically . . . alert

management" that "mail or wire fraud" was taking place.  *Id*. at 327.  Since *Platone*, the Second

Circuit endorsed the so-called "definitive and specific" test in an unpublished opinion.  *Vodopia*

*v. Koninklijke Phipps Elecs, N.V.*, 398 Fed. Appx. 659, 662-663 (2d Cir. 2010) (citations

omitted).  *But see* Second Circuit Local Rule 32.1(a) ("Rulings by summary order do not have

precedential effect.").  Following the *Vodopia* decision, however, the Department of Labor Administrative Review Board ("ARB") held, in *Sylvester v. Parexel Int'l LLC*, that it was error for an administrative law judge to require a plaintiff's communication to "have a sufficiently definitive and specific relationship to any of the listed categories of fraud or securities violations under 18 U.S.C. § 1514A(a)(1)" in order to be protected under Section 806.  ARB Case No. 07–123, 32 IER Cases 497, 508 (ARB May 25, 2011).  The ARB noted that the "definitive and specific" language used by some courts in the § 1514A context stems from case law concerning a different whistleblower statute, the Energy Reorganization Act, 42 U.S. § 5851 ("ERA").  "[I]n light of the ERA's overarching purpose of protecting acts implicating nuclear safety," the "definitive and specific" rule was determined to be necessary in the ERA context because that statute contains a catch-all provision protecting "any other action to carry out the purposes of this chapter."  *Id*. at 508-09.  By contrast, "[t]he SOX whistleblower protection provision contains no similar language, and instead expressly identifies the several laws to which it applies."  *Id*. at 509.  Thus, reasoned the ARB, the "definitive and specific" test is "inapposite" to the SOX whistleblower statute.  *Id.*  Indeed, according to the ARB, "[n]ot only is it inappropriate, but it also presents a potential conflict with the express statutory authority of § 1514A, which prohibits a publicly traded company from discharging or in any other manner discriminating against an employee for providing information regarding conduct that the employee 'reasonably believes' constitutes a SOX violation."  *Id*.; *see also Prioleau v. Sikorsky Aircraft Corp.*, ARB Case No. 10–060, 2011 WL 6122422, at *4-5 (ARB Nov. 9, 2011) (reversing administrative law judge's determination that a report was not protected because it "did not mention fraud or violations of the Securities Exchange Act").

   ARB Opinions are entitled to some level of deference from federal courts, although the level of deference still remains in dispute.  *Compare Leshinsky*, 873 F. Supp. 2d at 589 (giving

*Mead* deference to an ARB interpretation of Section 806) *with Wiest v. Lynch*, 710 F.3d 121, 133

(3rd Cir. 2013) (giving *Chevron* deference to ARB's rejection of the "definitive and specific"

test in *Sylvester*); *accord Wos v. E.M.A. ex rel. Johnson*, 133 S.Ct. 1391, 1404 (2013) (Breyer, J.,

concurring) ("I cannot measure the degree of deference with the precision of a mariner

measuring a degree of latitude.").   In any event, this Court agrees with the ARB that the

"definitive and specific" test is inapplicable to SOX violations, and it therefore is excluded from

the determination of whether Plaintiff's activity is protected under § 1514A(a)(1).

Simply stated, "the critical focus is on whether the employee reported conduct that he or

she *reasonably believes* constituted a violation of federal law," and "not whether that information

'definitively and specifically' described one or more of those violations." *Sylvester*, 32 IER

Cases at 509-10 (internal quotation marks and citation omitted).   A complainant fulfills his duty

under Sarbanes-Oxley when he "identif[ies] conduct that falls within the ample bounds of the

anti-fraud laws . . . ."   *Wiest*, 710 F.3d at 132; *accord* Procedures for the Handling of

Discrimination Complaints under the Sarbanes–Oxley Act, 69 Fed.Reg. 163, 52106 (Aug. 24,

2004) (noting that the purpose of a protected report is not to expose illegality, but to "trigger an

investigation to determine whether evidence of discrimination exists").[2]

---

[2] Moreover, even if there were a separate requirement under Section 806 that a whistleblower report describe a violation with a degree of particularity, Plaintiff would have met such a standard.  Courts have recognized that it would it be unfair to expect a plaintiff seeking to inform his boss of financial misbehavior to have a working knowledge of the United States Code.  *See, e.g.*, *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 Civ. 3824, 2011 WL 135026, at *6 (S.D.N.Y. Jan. 14, 2011)  (explaining that, while "the employee's communications must identify the specific conduct that the employee believes to be illegal," a whistleblower "need not cite to a code section he believes was violated in his communications to his employer . . . ." (quoting *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008))); *see also Fraser v. Fiduciary Trust Co. Intern.*, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006) (holding that,  "[w]hile general inquiries . . . do not constitute protected activity, a plaintiff "need not . . . cite a code section he believes was violated . . . ."  (internal quotation marks and citation omitted)); *Ashmore v. CGI Grp. Inc.*, No. 11 Civ. 8611 (LBS), 2012 WL 2148899, at *6 (S.D.N.Y. June 12, 2012) (same); *Gladitsch v. Neo@Ogilvy*, No. 11 Civ. 919 (DAB), 2012 WL 1003513, at *3, 7-8 (S.D.N.Y. Mar. 21, 2012)

### b.     Reasonable Belief as to a Violation

To demonstrate that a plaintiff engaged in a protected activity, a plaintiff must show that he "had both a subjective belief and an objectively reasonable belief that the conduct he complained of constituted a violation of relevant law." *Welch*, 536 F.3d at 275 (internal quotation omitted); *see also Fraser v. Fiduciary Trust Co. Int'l*, 396 F. App'x 734, 735 (2d Cir. 2010) (affirming the district court's dismissal of a SOX whistleblower claim because "the record evidence would not permit a factfinder to conclude that [the plaintiff] held both a subjectively and objectively reasonable belief that he was reporting conduct covered by the law"). In other words, "the employee must show both that he actually believed the conduct complained of constituted a violation of pertinent law and that a reasonable person in his position would have believed that the conduct constituted a violation." *Welch*, 536 F.3d. at 278 n. 4 (internal quotation marks and citation omitted).

Section 806 protects the providing of information concerning "any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, *or* any provision of Federal law relating to fraud against shareholders." (Emphasis added.) As Judge Marrero has noted, "[b]y listing certain specific fraud statutes to which § 1514A applies, and then separately, as indicated by the disjunctive 'or,' extending the reach of the whistleblower protection to violations of any provision of federal law relating to fraud against securities shareholders," the statute clearly

_____

(plaintiff's report that the defendant was "potentially defrauding the stockholders of the parent company" constitutes protected activity); *Harp v. Charter Communications, Inc.*, 558 F.3d 722, 725 (7th Cir. 2009) ("If the specific conduct reported was violative of federal law, the report would be sufficient to trigger Sarbanes–Oxley protection even if the employee did not identify the appropriate federal law by name." (citation omitted)). Here, Plaintiff told his supervisor that he was concerned about the morality of the two overhead scheme, and added that it "may even be illegal but I wasn't sure since I'm not a lawyer." This statement sufficiently alerted Defendant as to the possibility that there was possibly illicit conduct afoot. Plaintiff therefore sufficiently "provided information" under § 1514A.

protects employees who report any of the enumerated federal crimes, irrespective of whether the fraud affects shareholders. *O'Mahony v. Accenture Ltd.*, 537 F. Supp. 2d 506, 517 (S.D.N.Y. 2008); *see also Gladitsch*, 2012 WL 1003513, at *7-8 (same); *Ashmore*, 2012 WL 2148899, at *5 (same).

In his complaint, Plaintiff alleges that he reported both mail and wire fraud. Thus, it must be determined whether he subjectively believed, and whether it was objectively reasonable to believe, that he was reporting those crimes.

### i.    Objective Reasonableness: The Scheme's Plausibility

The question whether a plaintiff's belief was objectively reasonable is a "mixed question of law and fact," meaning that it should be decided by the Court only if there is no genuine issue of material fact as to the belief's reasonableness. *Welch*, 536 F.3d at 278; *accord Sylvester*, 32 IER Cases at 507 (noting that "[o]ften the issue of 'objective reasonableness' involves factual issues and cannot be decided in the absence of an adjudicatory hearing" (citing cases)). "In assessing the reasonableness of a plaintiff's belief regarding the illegality of the particular conduct at issue, courts look to the bases of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Sharkey*, 2011 WL 135026, at *6 (internal quotation marks and citation omitted).

Mail fraud requires proof of (1) the existence of a scheme or fraud, (2) an intent to deceive or defraud, and (3) the use of the mails for the purpose of scheming and/or defrauding; when the said scheming and/or defrauding is done through the wires rather than the mails, the offense is wire fraud . 18 U.S.C. §§ 1341, 1343.   In both wire and mail fraud cases, "[t]he Government need not show that the intended victim was actually defrauded, and may rely on proof that Defendants contemplated some actual harm or injury to their victims." *United States v. Finazzo*, No. 10 Cr 457, 2011 WL 3794076, at *3 (E.D.N.Y. Aug. 24, 2011) (citing *United*

16

*States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970)); *see also United States v. Falkowitz*, 214 F. Supp. 2d 365, 379 (S.D.N.Y. 2002) (explaining that mail and wire fraud "explicitly hinge on the existence of a scheme intended to defraud, using mail or wire means to further that deceptive purpose," and that "[t]he centrality of the relationship between the scheme and its unlawful purpose, as evidenced in the plain language of the statute, suggests that the nature of the victim is immaterial and that the proper inquiry concerning violation of the law should be on these criteria rather than on the nature of the victim" (citations omitted)).  Moreover, the existence of a scheme or fraud element has been given "a broad interpretation . . . to 'include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'  *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995) (quoting *Durland v. United States*, 161 U.S. 306, 313 (1896)) (alteration in the original).[3]

Defendants argue that it was not objectively reasonable for Plaintiff to believe that the two overhead rates scheme could possibly come to fruition.  But there are sufficient facts for a reasonable factfinder to find otherwise.  While Plaintiff had some familiarity with the MTA bidding process from his ten years as an MTA employee, he states that his "involvement was largely limited to examining functionality issues, and [he] was not familiar with all the technical procurement rules."  (Pl.'s Decl. at ¶ 3.)  Given the fact that the scheme was discussed at length in the meeting by persons more familiar with the process than Plaintiff, it was reasonable for Plaintiff to believe that the scheme was plausible.

Defendants contend that, "even if Caseta had had privately audited overhead rates, these would not have been sufficient for the MTA," both because the MTA "audits the pricing and its

---

[3] Plaintiff has testified, quite plausibly, that MTA bids were conveyed and followed up on using the wires or the mails.  (Pl.'s Decl. at ¶ 6.)  The Court's inquiry will therefore focus on the scheme to defraud element of mail and wire fraud.

components, including overhead rates, in submitted proposals" and because the MTA "required the submission of government-audited overhead rates." (Defs.' Mem. at 13.) It was Plaintiff's understanding from his time spent at MTA, however, that "[t]here was no hard and fast requirement that the overhead rate had to be audited by the government," and that "[s]ometimes MTA would accept overhead rates that were the subject of prior audits or that accorded with past practices without engaging in detailed line by line negotiations." (*Id*. at ¶ 5.)[4]

In sum, there is sufficient evidence to permit a factfinder to conclude that Plaintiff reasonably believed that the two overhead rates scheme could be plausibly carried out by Defendants.

### ii.   Objective Reasonableness: The Scheme's Development

Defendants next argue that it would not have been reasonable for Plaintiff to believe that a scheme was underway, as "no violation had occurred and there was no violation in progress . . . when [Plaintiff] made his report." (Defs.' Mem. at 8.) Defendants point out that at the meeting's end, there was no agreement that the "two overhead" scheme would be implemented, and that the specificities of the scheme had not yet been discussed or worked out.

The Fourth Circuit has held that "the statute requires [a plaintiff] to have held a reasonable belief about an *existing* violation, inasmuch as the violation requirement is stated in the present tense: a plaintiff's complaint must be 'regarding *any conduct which [he] reasonably believes constitutes a violation* of [the relevant laws].'" *Livingston,* 520 F.3d at 352 (quoting § 1514A(a)(1)) (alteration in the original). In other words, according to the *Livingston* Court, a

---

[4] Additionally, according to Defendants, the fact that the two overhead rate scheme was never relied upon is now evidence that the scheme was never to be implemented. (Defs.' Mem. at 9.) That the two overhead scheme was not implemented, however, could also plausibly be a *result* of Plaintiff's decision to voice his disapproval to Deitiker.

report could not concern a claim that "a violation is about to happen upon some future contingency." *Id.* (citation omitted.)

Earlier this year, the Third Circuit, following the lead of the ARB in *Sylvester*, rejected the notion that a violation must be "existing" in order for a report to be protected, holding instead that "Section 806 protects an employee's communications about a violation that has not occurred 'as long as the employee reasonably believes that the violation is likely to happen.'" *Wiest*, 710 F.3d at 133 (citing *Sylvester*, 32 IER Cases at 508).[5]  This Court agrees with the Third Circuit and the ARB that imminent crimes, or at least crimes in their infancy, are within the scope of Section 806.  As the *Wiest* court noted, "[i]t would frustrate [the purpose of Sarbanes-Oxley] to require an employee, who knows that a violation is imminent, to wait for the actual violation to occur when an earlier report possibly could have prevented it." *Id.*; *cf. Walters v. Deutsche Bank AG*, No. 2008 SOX 70, 2009 WL 6496755, at *9 (ALJ Mar. 23, 2009) ("Senator Leahy justified the protection Section 806 affords to whistleblowers based on the importance of the unique, inside, financial perspective they can provide . . . [Section 806 was] designed to encourage insiders to come forward without fear of retribution.").  It furthers the purpose of Section 806 to nip corporate wrongdoing in the bud, rather than permitting a scheme to blossom into a full-fledged crime before whistleblower protections take effect.  Whistleblowers should not be asked to wait until executives have dotted the i's and crossed the t's before sounding an alarm.

The relevant question, therefore, is whether, construing the facts in the light most favorable to Plaintiff, it was objectively reasonable to believe that either mail fraud or wire fraud

---

[5] Since *Sylvester*, the ARB has consistently held that "disclosures concerning violations about to be committed (or underway) are covered as long as it is reasonable to believe that a violation is likely to happen." *Funke v. Federal Express Corp.*, ARB 09-004, slip. op. at *11(ARB July 8, 2011).

was taking place, or was on the verge of taking place.  Construing the facts in the light most favorable to Plaintiff, the Court finds sufficient evidence that it was.

Defendants argue that, even if the scheme was possible to implement, there were simply too many contingencies between the meeting and its implementation for a reasonable person to believe that the scheme was in progress or imminent.  While it is true that Defendants had not yet decided to implement the scheme—and that doing so would have required certain contingent events that had not yet taken place—the discussion in the meeting concerning the use of the "two overhead rates" scheme was sufficiently substantive for a reasonable person to believe that mail or wire fraud was imminent, if not already in progress.[6]  Moreover, the reasonableness of Plaintiff's belief that the scheme might be employed was "reinforced by [his] employer's reaction" to Plaintiff's report.  *Gladitsch*, 2012 WL 1003513, at *8; *see also Ryerson v. Am. Express Fin. Servs., Inc.*, 2010 WL 303 1375, at *6 (employer's response to protected report can be evidence that employee's belief was reasonable).

In sum, viewing the evidence in Plaintiff's favor, it was objectively reasonable for an employee of Plaintiff's background and experience to conclude that a fraudulent scheme requiring the use of the mails, telephone lines, and email was imminent or in progress.  *Accord Ashmore*, 2012 WL 2148899, a *6.

---

[6] Although this Court has rejected the "existing violation" test, it also likely would have been reasonable for Plaintiff to believe that mail or wire fraud was "existing."  According to the Fourth Circuit, a violation is "existing" only if it is "in progress."  *Livingston*, 520 F.3d at 352 (*quoting Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 340-41 (4th Cir. 2006)).  This merely begs the question, however, of what it means for a scheme to be "in progress."  In *Jordan*, the Fourth Circuit explained that a plan is "in progress" when it is "taking shape." *Jordan*, 458 F.3d at 342.  Because mail or wire fraud are committed as soon as there is a "scheme to defraud" and the "use of the mails [or wires] to further the scheme," *Fountain v. United States*, 357 U.S. 250 (2d Cir. 2004) (citing *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)), the record suggests that it would have been reasonable for a person in Plaintiff's position to surmise that mail or wire fraud was "taking shape" or "in progress."

### iii.    Subjective Belief

Plaintiff must also have had a subjective belief that fraud was taking place.  After all, irrespective of whether Plaintiff reported a violation of the relevant law, "[i]t would make no sense to allow [a plaintiff] to proceed if he himself did not hold the belief required by the statute . . . ."  *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008).

Plaintiff reported to Deitiker that he believed that the two overhead strategy "may even be illegal but I wasn't sure since I'm not a lawyer," and this is sufficient evidence for a jury to find that he was in fact concerned about the legality of Defendants' conduct.  *Cf. Gale v. U.S. Dep't of Labor*, 384 Fed. Appx. 926, 930 (11th Cir. 2010) (plaintiff lacked subjective belief where he admitted at his deposition that he "did not actually believe that WFG's activities were illegal or fraudulent" and where plaintiff "made several other statements indicating his lack of a subjective belief").

The Court agrees with Defendants, however, that Plaintiff's decision to report his concern solely to Deitiker is evidence that tends to support Defendants' position.  This silence is hard to square with Plaintiff's history of resisting improper actions by superiors, and it is peculiar that Plaintiff would have decided not to relay his concerns at least to his long-time friend Yermack, especially since Plaintiff had complained to Yermack about Deitiker before.  (*See* Defs.' 56.1 at ¶¶ 104-06.)  Nonetheless, the Court's inquiry is whether there is sufficient evidence that Plaintiff had a reasonable belief, not whether he shared that belief with his superior.  *Accord Knox v. U.S. Dept. of Labor*, 434 F.3d 721, 725 (4th Cir. 2006) ("Although the contents of Knox's complaints may provide evidence of his reasonable beliefs, it does not follow that he must have necessarily conveyed a notion to have reasonably believed it, as the ARB demanded of him. Indeed, in the very first sentence of this paragraph, the ARB seemed to accept as true, evidence that Knox did, in fact, reasonably believe that asbestos was emitted into the ambient air.")  Construing the facts

in the light most favorable to Plaintiff, it is possible that, having "ang[ered]" Deitiker by "expressing [his] reservations," Plaintiff thought he would be better served by thereafter remaining quiet about his reservations.  (Defs.' 56.1 at ¶ 95.)  In any event, because there is a genuine dispute of fact as to this material issue, this is a question for the finder of fact, not the Court.  *Accord Van Asdale v. Inter'l Game Technology*, 577 F.3d 989, 1002 (9th Cir. 2009).

### c.      The Report to Deitiker

Defendant contends that a report lodged with "a superior who has made clear that he will do nothing about the misconduct . . . is not really a report at all."  (Defs.' Mem. at 16-17.)  It appears that no federal courts, in this circuit or elsewhere, have yet addressed whether a report to a superior who is implicated in the reported conduct is covered under Section 806.  This Court concludes that such reports are covered under the Sarbanes-Oxley retaliation provision.

First and foremost, the language of the statute clearly indicates that such a report should be protected.  Section 1514A(a)(1)(C) provides that a plaintiff's actions are protected if he reports to, *inter alia*,  "a person with supervisory authority over the employee."  By protecting all persons who report to "a" supervisor, Congress chose to provide broad protection to whistleblowing employees without narrowly limiting the class of persons to whom they may report wrongdoing.

Defendants nonetheless insist that such an exception is consistent with Congress's intent to assure the discovery of corporate malfeasance.  Acknowledging that this question is one of first impression under Sarbanes-Oxley, Defendants argue in their Reply brief that, in cases concerning the federal employees' Whistleblower Protection Act ("the WPA"), "courts are categorical" that "'disclosure of wrongdoing to the wrongdoer [him]self is not whistleblowing.'" (Defs.' Rep. at 1-2 (quoting *Hooven-Lewis v. Caldera*, 249 F.3d 259, 275 (4th Cir. 2001) (citing *Willis v. Dept. of Agriculture*, 141 F.3d 113, 1143 (Fed. Cir. 1999))); *accord Fraser v. Fiduciary*

*Trust Co., Intern.*, No. 04 Civ. 6958 (RMB) (GWG), 2005 WL 6328596, at *6 (S.D.N.Y. June

23, 2005) ("In the absence of caselaw interpreting 18 U.S.C. § 1514A ('Section 806'), courts

look to caselaw applying provisions of other federal whistleblower statutes for guidance . . . ."

(internal quotation marks and citation omitted)).  It is true that the Federal Circuit has

traditionally read the WPA as not protecting government employees who report "misconduct by

a wrongdoer to the wrongdoer." *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1350 (Fed.

Cir. 2001).  It is also true that, in so doing, the Federal Circuit believed that such a rule was

"compelled by the purpose of the statute."  (Defs.' Rep. at 2.)[7]  Defendants' argument, however,

suffers from a fatal flaw: As the Federal Circuit has recently acknowledged, *see Nasuti v. Merit*

*Sys. Protection Bd.*, 2013 WL 163827, at *1 (Fed. Cir. Jan. 16, 2013), its narrow interpretation of

the WPA recently has been definitively overturned by Congress.  *See* Whistleblower Protection

Enhancement Act of 2012, Pub. L. No. 112–199, § 101(b)(2)(C), 126 Stat. 1465, 1465–66; *see*

*also* 5 U.S.C.A. § 2302(f)(1)(A)-(B) (providing that "[a] disclosure shall not be excluded from"

the WPA's protection either because "the disclosure was made to a supervisor or to a person who

participated in an activity" or because "the disclosure revealed information that had been

previously disclosed").  In rejecting the Federal Circuit's narrow reading of the WPA, Congress

made crystal clear its intent that *any* whistleblower who reports misconduct via one of the

enumerated channels be protected under federal whistleblower statutes.  *See* S. Rep.  No. 112–

155, at 4-5 (2012) (criticizing the Federal Circuit for "undermin[ing]" the "plain language" of the

---

[7] The *Huffman* Court reasoned that, when an employee reports to a wrongdoer, "the employee is
not making a 'disclosure' of misconduct.  If the misconduct occurred, the wrongdoer necessarily
knew of the conduct already because he is the one that engaged in the misconduct."  *Huffman*,
263 F.3d at 1350.  The WPA protects persons who make "disclosures," while Section 806
protects persons who "provide information."  *Compare* 5 U.S.C.A. § 2302(a)(2)(D) *with* 18
U.S.C. § 1514A(a)(1).  As Defendants note, however, Congress appears to consider the phrase
"provide information" as synonymous with the phrase "disclose information."  S. Rep. No. 107-
146 at 13.

WPA by "imposing limitations on the kinds of disclosures by whistleblowers that are protected").[8]

Thus, the plain language of Sarbanes-Oxley, as well as Congress's recent decision to overrule the Federal Circuit's interpretation of the analogous WPA, compel the interpretation that a report by an employee to his supervisor is protected under the statute, even if that supervisor is implicated in the wrongdoing. A holding to the contrary would also contravene the very purpose of the Sarbanes Oxley's whistleblower provisions, by facilitating rogue supervisors hoping to silence employees, and discouraging employees otherwise inclined to raise concerns about the legality of company policy from doing so. *Accord* S. Rep. No. 112–155, at 5 (explaining that Congress overturned the Federal Circuit's interpretation of the WPA because "[i]t is critical that employees know that the protection for disclosing wrongdoing is extremely broad and will not be narrowed retroactively by future MSPB or court opinions. Without that assurance, whistleblowers will hesitate to come forward"). Once an employee reports illegal conduct, it is the company's job to stop it. The language and purpose of the statute do not support a rule that could have the effect of rewarding, rather than punishing, companies that have placed in positions of power individuals unwilling to follow federal law.

### 2.    Contributing Factor

Plaintiff also must demonstrate that a genuine issue of material fact exists as to whether his whistleblowing was a contributing factor in his termination. "The words 'a contributing factor' mean any factor which, alone or in connection with other factors, tends to affect in any

---

[8] The Senate Report observed the "evident tendency of adjudicative bodies to scale back the intended scope of protected disclosures." S. Rep. No. 112–155, at 4-5. Although the Report was referring to the WPA, commentators have similarly noted that the "dramatic[] narrowing [of] the scope of Sarbanes-Oxley's protections" has made the retaliation provision a less effective tool for encouraging whistleblowing. Richard Moberly, *Sarbanes-Oxley's Whistleblower Provisions: Ten Years Later*, 64 S.C. L. Rev. 1, 39 (2012).

way the outcome of the decision." *Pardy v. Gray*, No. 07 Civ. 6324 (LAP) 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008) (Preska, J.) (citing *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).  "A plaintiff need not prove that her protected activity was the primary motivating factor in her termination, or that the employer's articulated reason was pretext in order to prevail." *Barker v. UBS AG*, 888 F. Supp. 2d 291, 300 (D. Conn. 2012) (citation omitted).

Defendants first argue that, even assuming Plaintiff engaged in a protected activity, "the five-month time gap is too remote to establish a causal connection between the alleged protected activity and his termination." (Defs.' Rep. at 19.)  Temporal proximity is an important, though not necessarily determinative, piece of evidence concerning the motivating factors behind terminating an employee. *Pardy*, 2008 WL 2756331, at *5.  Moreover, while the Second Circuit has declined to "draw[] a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), where a plaintiff relies solely on temporal proximity to prove causation, the protected activity and the plaintiff's termination must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation omitted); *see also Garrett v. Garden City Hotel, Inc.,* No. 05 Civ. 0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (noting that "in the absence of other evidence of defendant's retaliatory motive [a time lapse of two and a half months] precludes a finding of a causal connection between the protected activity and the adverse employment action").  Indeed, in this circuit, "[c]laims of retaliation are routinely dismissed when as few as three months elapse between the protected [] activity and the alleged act of retaliation." *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) (collecting cases).

25

Where an employee provides other evidence indicating a connection between his protected activity and his termination, however, courts in this circuit allow for a more relaxed temporal proximity.  *See, e.g.*, *Gorman-Bakos*, 252 F.3d at 545 (five months between protected activity and termination was "not too long to support" a claim for retaliation where "subsequent retaliatory actions" occurred in between the initial protected activity and the termination); *Barker*, 2012 WL 2361221, at *8 (sufficient causal connection existed despite five month gap between reporting and termination, where in between plaintiff was overlooked for assignments and given unfavorable reviews); *Mahony,* 2007 WL 805813, at *6 ("A reasonable juror could find that the string of retaliatory acts culminating in Plaintiff's termination is evidence that Plaintiff's protected activity was a contributing factor in the adverse employment action." (citations omitted)).  Here, Plaintiff has proffered some evidence indicating that he was marginalized directly after his report to Deitiker and up until his termination.  Given this evidence, Plaintiff's protected activity and termination are within sufficient temporal proximity to survive summary judgment.

Next, Defendants argue that Plaintiff cannot prove causation because, "with the exception of Deitiker, *none* of [the individuals who made the decision to terminate Plaintiff] were aware of Plaintiff's alleged complaint."  (Defs.' Mem. at 21.)  Even if that were the case, however, the fact that one of the persons responsible for Plaintiff's termination knew of the protected activity provides the jury with sufficient evidence to find that Plaintiff's report was a proximate cause of his termination.  *Cf. Staub. v. Proctor Hosp.*, 131 S.Ct. 1186 (2011) (holding that an employer may be held liable when a supervisor is a proximate cause of the termination, even where the ultimate decisionmaker lacks the requisite animus).

Finally, Defendants argue that they have indisputably established that Plaintiff was terminated due to the need to reduce the workforce, Plaintiff's subpar job performance, and a

litany of instances of embarrassing and unprofessional workplace behavior.  The record leaves little doubt that legitimate frustrations with Plaintiff played a large role in his firing.  However, it is not *beyond genuine dispute* that legitimate reasons *alone* motivated Plaintiff's firing.  *Accord Barker*, 888 F. Supp. 2d at 302-03 (summary judgment denied in Section 806 action despite plaintiff's "performance and interpersonal issues"); *see also id.* at 300 n.4 (a plaintiff does not have a higher burden of proof where a defendant contends that the termination was a reduction in force). [9]

Thus, genuine disputes of material fact exist as to whether Plaintiff's report was a contributing factor in Plaintiff's termination.

### D.      Non-Retaliatory Rationale

Because Plaintiff has established his *prima facie* case, summary judgment is warranted only if Defendant can demonstrate that, as a matter of law, there is "clear and convincing" evidence that Plaintiff would have suffered the same unfavorable action even in the absence of the retaliatory factor.  For the reasons set forth in section II.C.2 of this opinion, *supra*, Defendant cannot make such a showing.

### E.      Summary Judgment Against Escribá

Defendant Escribá has separately moved for summary judgment, arguing that there is no evidence that he had any knowledge of Plaintiff's complaints about the nascent scheme to

---

[9] While Plaintiff's protected activity is not within close temporal proximity to his termination, neither are some of the purported non-discriminatory reasons for Plaintiff's firing temporally proximate to Defendants' decision to terminate Plaintiff.  For example, one of the purported reasons for Plaintiff's firing was his misbehavior at a dinner in late 2007; two other purported reasons for the firing—Plaintiff's missing an important telephone call and Plaintiff's misbehavior at a conference in Orlando—also took place months before he was terminated.  This provides some reason to doubt Defendants' contention that Plaintiff's misbehavior and poor work were the sole reason for Plaintiff's termination.  Moreover, Plaintiff was discouraged from leaving by Yermack in the spring of 2008—when much of the misbehavior had already taken place—because Plaintiff was, even at that point, "important to the operation."  (Yermack Dep. at 108:21-22.)

defraud the MTA.  Retaliation cases must often be proven with "the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file."  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *see also Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 83 (2d Cir. 2005) (observing in a Title VII  case that "'[k]nowledge' is a fact often established—even in criminal cases where the prosecution's burden is beyond a reasonable doubt—simply through circumstantial evidence" (citations omitted)).  In retaliation cases, however, "district courts have consistently held that, with regard to the causation prong of the *prima facie* standard, '[a]bsent any evidence to support an inference that [the decisionmakers] knew of [p]laintiff['s] [protected activity], [p]laintiff cannot rely on circumstantial evidence of knowledge as evidence of causation.'"  *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257 (S.D.N.Y. 2007) (collecting cases); *see also Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (explaining that "the lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection").

　　　Here, Plaintiff has failed to point to any substantive evidence supporting an inference that Escribá knew of Plaintiff's report to Deitiker.  Thus, there is no genuine dispute of material fact as to Escribá's knowledge of Plaintiff's protected activity.  Plaintiff's claim against Escribá must therefore be dismissed.

**III.    Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.  Plaintiff's retaliation claims under Section 806 of Sarbanes-Oxley survive against all Defendants except Escribá.

The Clerk of the Court is directed to close the motion at Docket Number 48.


SO ORDERED.


Dated:  New York, New York
        May 1, 2013

_____
                J. PAUL OETKEN
          United States District Judge